Daniel J. TAYLOR, Plaintiff,

v.

CORDIS CORPORATION, Defendant.

Civ. A. No. J86–0128(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

April 30, 1986.

Harry E. Neblett, Jr., Copeland, Cook, Taylor & Bush, Jackson, Miss., for plaintiff.

Neville H. Boschert, Watkins, Ludlam & Stennis, Jackson, Miss., for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause came before the court on the complaint of plaintiff Daniel J. Taylor for a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that a non-competition agreement in Taylor's contract of employment with defendant Cordis Corporation (Cordis) is void and unenforceable. Cordis counterclaimed for a preliminary injunction to enforce the agreement. Following a hearing on February 28, 1986, this court on March 4, 1986 entered a temporary restraining order enjoining Taylor from soliciting or contacting any customer, client or lead with whom he had contact in Mississippi, less the Gulf Coast area, during his employment by Cordis, for the purpose of sales of products or services in competition with Cordis. In the instant action, Cordis seeks a preliminary injunction incorporating and extending the relief granted in the temporary restraining order, and further seeks to have the court broaden its order to prevent Taylor from contacting, for the sale of *any* medical product, any customers, clients or leads he acquired while employed by Cordis. Upon a review of the evidence adduced at the bench trial, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Taylor began working as a medical supplies salesman for McNees Medical Supply after his graduation from college in 1969 and he has been in medical supplies sales since that time. Upon leaving McNees in 1974, Taylor worked for Deseret, selling intravenous products, EKG equipment and surgical products, until 1977. From 1977 to 1981, Taylor was a sales manager for Healthco for which he sold medical supplies and prostheses within a fifty-mile radius of Jackson, Mississippi. At no time between 1969 and 1981 did Taylor market or sell heart pacemakers or pacemaker products.

Taylor began his employment with Cordis on February 13, 1981. The Cordis products line which Taylor was authorized to sell included heart pacemakers, pacemaker lead introducers and vascular catheters. Shortly after he started with Cordis, Taylor was sent to Memphis, Tennessee for a technical training course in anatomy, physiology and electrophysiology. He subsequently attended a training course in Cordis products in Miami, Florida. Additionally, he received miscellaneous periodicals and other documents relating to pacemaker technology, which information was regularly updated through company newsletters and information sheets distributed over the course of his employment. Thomas V. Brown, Cordis' vice president of sales and marketing for all of North America, testified at trial that the extent of the training that a new salesman must receive depends upon his prior sales experience and his knowledge of pacemaker technology. Brown stated that the pacemaker sales industry is a highly technical, dynamic and competitive one and that it requires even a superlative salesman some time to "work up to speed" in the field of pacemaker sales. Although Taylor had extensive experience in sales of medical supplies in the Mississippi area and was familiar with the local physicians who regularly implanted pacemakers, he received technical training on pacemakers during his employment with and at the expense of Cordis. It appears that it took him over a year to develop sufficient technical expertise, combined with cultivating the trust and confidence of the implanting physicians, to attract any significant portion of the market. This is evidenced by the fact that in fiscal year 1981–82, Taylor's first full year with the company, he sold 13 pacer units; in fiscal

year 1982–83 he sold 84 pacer units; in fiscal year 1983–84 he sold 98 pacer units; and in fiscal year 1984–85 he sold 119 pacer units.

On February 13, 1981, the first day of Taylor's employment with Cordis, he signed as part of his employment contract a document entitled "Employment Agreement with Respect to Proprietary Information and Unfair Competition" (agreement). It was undisputed at trial that signing such agreement was a condition precedent to Taylor's employment with Cordis. Brown testified that such agreements are utilized by all the major competitors in the pacemaker business. Paragraphs 1 and 4 of the agreement read as follows:

1. That during your employment with Cordis and for six months after employment, you will not directly or indirectly own, operate, manage, consult with, control, participate in the management or control of, be employed by, maintain or continue any interests whatsoever in any enterprise that designs, manufactures, distributes, markets or promotes medical devices or their components in competition with Cordis (a "conflicting organization"), in the same geographical area for which you were primarily responsible at the time of termination of your employment, without the written consent of an officer of Cordis.

\* \* \* \* \* \*

4. You agree that during your employment with Cordis and for one year after termination of such employment, you will not solicit or contact any of the customers, clients, or leads with whom you have had contact during your employment by Cordis for the purpose of sales of products or services in competition with Cordis and will not disclose the names of Cordis' customers, clients, and leads or any part thereof, to any person or entity for any reason or purpose whatsoever.

The agreement delineates no specific geographical territory. Cordis representatives testified that the "Mississippi territory" comprised all of Mississippi except six counties: Pearl River, Stone, George, Hancock, Harrison and Jackson along the gulf coast. Although there is some confusion in the record concerning areas of northern Mississippi that were outside of the Mississippi territory, it appears that Taylor understood his territory to cover all of northern Mississippi with the possible exception of some cities and counties in the Mississippi Delta. Defendant's exhibit 28, however, sets forth the names of every physician in the Mississippi territory who bought Cordis products from Taylor and the cities in which those physicians practice with the exception of Dr. Earl Fyke.[1]

Taylor testified that he received no customer list at the outset of his employment with Cordis. Indeed, it appears from the record that only two physicians in the Mississippi territory were Cordis customers when Taylor began in February 1981. The evidence showed that, of the physicians who bought Cordis products from Taylor, twenty-five percent were customers of his prior to February 1981 and approximately fifty percent were acquainted with him prior to February 1981.

Much testimony was adduced at trial concerning the nature of the pacemaker sales industry. Sales are normally made directly to the hospital wherein the implant surgery is to be performed, but the decision to purchase a certain type pacemaker is made by a physician. As in most sales contexts, but more particularly so in the pacemaker business, a sale is the product of close contact and mutual confidence between the salesman and the physician. Only when the physician feels that he can trust and rely upon the representations of the salesman concerning the quality of the product does a sale occur. Implanting physicians regularly request the presence of the salesman of the pacemaker at the actual implant surgery. Although the salesman never "scrubs up" or invades the sterile field, he

---

1. Dr. Fyke's name does not appear on exhibit 28 but it was established without dispute that he has purchased Cordis pacemakers from Taylor.

provides the doctor with technical information during surgery. Thus, the trust and reliance so crucial to pacemaker sales is placed as much in the sales representative as in the product. The potential for economic abuse should a salesman begin suggesting that the doctor use another brand of pacemaker was shown during the examination by counsel for Taylor of Thomas V. Brown. Brown testified that when Robert Poole, a Cordis salesman in the Dallas, Texas area, left Cordis to work with a competitor, he took approximately eighty percent of Cordis' business with him. Poole was not bound by a non-competition agreement.

Plaintiff testified that in 1984, 1985 and early 1986, he became increasingly concerned about the quality and marketability of Cordis pacemakers. His concern stemmed from the frequency of recalls of Cordis pacemakers issued by the United States Food and Drug Administration (FDA) and the frequency with which notices were distributed by Cordis to its sales force and physicians with respect to defects in design and performance of its pacemakers. On December 5, 1983, Cordis issued an "Urgent Medical Device Notification" for certain Gamma series pacemakers which were experiencing "early battery depletion" due to "self-discharge." This notice was followed by an "Important Update on Notification Concerning Gamma Series Pacers" issued on April 18, 1984. These notices recommended close supervision of patients with Gamma series implants, especially pacer-dependent patients.[2] On October 5, 1984, Cordis issued a "Heat-Stressed Pacer Notification" to its sales force, recommending monthly monitoring of patients implanted with heat-stressed pacers. The FDA classified this notice as a recall. On March 1, 1985, Cordis issued another "Ur-

gent Medical Device Notification" for the Gamma series pacemakers, warning again of early battery depletion. This was followed by a similar notification, also classified by the FDA as a recall, on April 19, 1985, relating to certain Lambda and Theta series pacemakers but warning of sudden failures due to the breaking of a wiring board connection in the pacemakers and recommending explanting such pacemakers. On January 9, 1986, Cordis issued an "Important Pacer Information" notice advising the sales force and physicians that the service life predictions for certain Gamma series pacemakers was being reduced from seven to five years due to tests indicating early battery depletion or failure of the pacemakers. By letter dated September 7, 1984 to Cordis' president from the director of the Center for Devices and Radiological Health of the United States Department of Health and Human Services, Cordis was advised that certain of its notifications to physicians and its sales force were inadequate to convey the severity of the problems with its pacemakers, and that certain other notifications of problems should be issued immediately.[3]

Taylor contends that as a result of the recalls and reliability problems of Cordis pacemakers, he suffered repeated humiliation and embarrassment when he had to inform the physicians of the recalls or notifications. He avers that these constant problems diminished the confidence that the physicians had in him and the products he sold, thus damaging his business reputation and credibility. Taylor testified that he concluded in December 1985 that Cordis products were "unmerchantable."

On February 18, 1986, Taylor voluntarily resigned from Cordis. He filed this declaratory judgment action the same day. On

---

**2.** Pacer-dependent patients are defined as those who are dependent on the pacemaker to sustain normal heart functions, and those for whom battery depletion or other malfunction of the pacemaker could result in serious threat of physical impairment or death.

**3.** Cordis' relevancy objection to the admissibility of the documents detailing the FDA's investiga-

tion of Cordis products, on which the court reserved ruling, is overruled. Taylor's objection to the admissibility of newspaper articles relating to investigation of Pacesetter, Inc. is sustained. Likewise, Taylor's objection to admissibility of evidence relating to recalls of Pacesetter pacemakers is sustained.

the next day, Taylor began promoting the sale of medical products on behalf of Cardio-Life Systems, Inc. of Baton Rouge, Louisiana. It appears that Taylor signed a contract of employment with Cardio-Life on February 19, the day after he resigned from Cordis, but that the terms and conditions of his new employment, and his acceptance thereof, were reached sometime prior to February 19. Cardio-Life is the exclusive distributor in Mississippi and Louisiana of pacemakers and other medical supplies for Pacesetter Systems, Inc. and Siemens Medical Systems, Inc., direct competitors of Cordis in the sale of pacemakers.

Also on February 19, 1986, Taylor received a call from Dr. Harvey Sanders of Jackson, who had purchased Cordis pacemakers from Taylor in the past, requesting Taylor's presence at an implant to be performed that night. Taylor informed Sanders that he had terminated his employment with Cordis the day before and could not sell a Cordis pacemaker, but that Sanders could call Gerald Thompson, another Cardio-Life salesman, to inquire about a Pacesetter pacemaker. Sanders did purchase a Pacesetter pacemaker from Thompson on February 19, and it is undisputed that Taylor was present and assisted during the operation in which Sanders implanted the pacemaker. It appears that Taylor has assisted Sanders in an implant of a Pacesetter pacemaker on at least one other occasion after February 19. Dr. Sanders has not implanted a Cordis pacemaker since Taylor left the company. Additionally, Taylor has contacted all the doctors to whom he sold Cordis products and informed them that he is now with Cardio-Life. He has not offered to sell those doctors Pacesetter or Siemens pacemakers, but he has informed them that Gerald Thompson is available to sell such products.

## CONCLUSIONS OF LAW
### DUTY OF GOOD FAITH AND THE MERCHANTABLE PRODUCT

Taylor contends that the contract of employment he signed with Cordis, specifically the agreement, is void and unenforceable on two grounds: Cordis has breached the implied duty of good faith and fair dealing it owed to its agent Taylor in failing to timely provide him with material information relating to problems it had discovered in its pacemakers; Cordis has failed to furnish him with a safe, merchantable and competitive product to sell. Taylor concludes that such action by Cordis entitles him to the equitable remedy of rescission.

■ The court recognizes that a principal has a duty to deal fairly and in good faith with an agent and to provide the agent with any information which might subject the agent to physical or pecuniary loss in dealing with the product. *See* Restatement, *Agency* (2d ed.) § 435; 3 Am. Jr.2d *Agency* § 238; *Lawrence Co. v. Twohig*, 224 F.2d 493, 497 (8th Cir.1955). The principal's good faith duty to the agent also demands that the principal must maintain a standard of conduct which will not harm the agent's business reputation or reasonable self-respect. Restatement, *Agency* (2d ed.) § 437 (comment).

Taylor alleges that Cordis breached its duty of good faith by failing to provide its sales force with timely, accurate information concerning the serious problems it had found in its Gamma series pacemakers. Taylor makes no allegation that Cordis failed to provide him with the various notifications it issued beginning in December 1983. Harold Hershenson, executive vice president of Cordis in charge of corporate product assurance, testified by deposition that sales agents "always" receive copies of the notifications sent to doctors, and that usually the agents are notified first and asked to consult with the doctors before their notifications arrive. Specifically, however, Taylor contends that Cordis became aware of the battery-depletion problem with its Gamma series pacemakers as early as 1980 but failed to inform the sales force of such problems until the December 1983 notification. Taylor further alleges that Cordis was aware of problems in all its

pacemakers for a considerable period before notifying its sales force.

This court does not agree with Taylor's construction of the principal's good faith duty to inform the agent of product problems. The duty cannot be interpreted to require the principal to distribute to the agent copies of consumer complaints relating to product performance or to report the progress of all ongoing research into product efficiency. It appears to the court that Cordis' actions, beginning in 1980, to identify and remedy the battery-depletion and other related problems in its pacemakers were reasonable under the circumstances. The duty to inform its sales agents of product problems attached only when the company, in the exercise of reasonable diligence, knew that specific product defects posed a threat of harm to consumers and a concomitant threat to the professional reputation of the sales agent. Therefore, the court concludes that Cordis' failure to inform Taylor of all product problems before the issuance of the notifications does not entitle him to the equitable remedy of rescission. Taylor's claim that Cordis' failure to timely provide material information constitutes fraud or misrepresentation has also not been established for the reasons stated above.

A similar conclusion is compelled by the proof on Taylor's claim that he is entitled to rescission because Cordis pacemakers were defective and unmerchantable. Relying on general statements of legal principles found in 2A C.J.S. *Agency* § 129, 3 C.J.S. *Agency* § 318, 3 Am.Jr.2d *Agency* § 49, Taylor concludes that where the products furnished the agent for sale are not reasonably fit for their intended purpose or are defective, the principal has breached an implied warranty and the agent is entitled to rescind the agency contract. It is useful to note that Cordis pacemaker sales for fiscal year 1985 totalled some $88,000,-000.00, and for fiscal year 1984 totalled some $99,000,000.00. Also, Brown testified without dispute that Cordis is the third leading seller of pacemakers in the United States and ranks second worldwide. It is thus impossible for this court to determine that Cordis pacemakers do not pass without objection in the trade or are not fit for the ordinary purposes for which such goods are used as the term "merchantable" is defined in § 2-314 of the Uniform Commercial Code. The fact that the product may contain certain defects and is imperfect in some respects does not, at least in a case of pecuniary loss and not physical injury, make the product "unmerchantable." Taylor's sales records over the 1983-85 period indicate Cordis was providing him with a merchantable product and that his business reputation was suffering no irreparable injury.

## PRELIMINARY INJUNCTION

The criteria for the issuance of a preliminary injunction are well settled in the Fifth Circuit. The moving party must demonstrate:

1. A substantial likelihood that the movant will prevail on the merits;

2. A substantial threat that the movant will suffer irreparable injury if the injunction is not granted;

3. That the threatened injury to the movant outweighs the threatened harm the injunction may do to the nonmoving party; and

4. That granting the preliminary injunction will not disserve the public interest. *Canal Authority v. Callaway,* 189 F.2d 567, 572 (5th Cir.1979). A preliminary injunction is extraordinary relief and should only be granted upon a clear showing by the plaintiff. *Id. Substantial Likelihood of Success on the Merits.*

The Mississippi Supreme Court has held that certain non-competition agreements are valid and enforceable. *See, e.g., Donahoe v. Tatum,* 242 Miss. 253, 134 So.2d 442 (1961). The court has recognized, however, that such an agreement "restricts the exercise of a gainful occupation [and] is a restraint of trade." Accordingly, the Mississippi courts require more than

[t]he fact that an employer has a written agreement that the employee will not, on

leaving his employment, compete with his employer, that the employee breaks that agreement, that the employee quits his employer, that the employee starts working for a rival, and that the rival thereby becomes a more efficient competitor. . . .

to enforce a non-competition agreement. *Thames v. Davis & Goulet Ins. Co.,* 420 So.2d 1041, 1043 (Miss.1982) (emphasis omitted). The court carefully scrutinizes the particular circumstances of each case to maintain a reasonable balance between "unfair competition by an ex-employee [and] unreasonable oppression by an employer." *Donahoe v. Tatum,* 242 Miss. 253, 134 So.2d 442, 445 (1961). In *Donahoe,* the court held:

A bargain by an employee not to compete with the employer after the employment has terminated falls within this permissible category, provided the agreement is within such territory and during such time as may be reasonably necessary for the protection of the employer, without imposing undue hardship on the employee, and provided there is a reasonable basis for the covenant. The validity of such an agreement is dependent upon such considerations as the nature and character of the employment, the size and conditions of the locality to which the prohibition extends, and the duration of the prohibition. In short, the evidence must show the reasonableness of the restriction with respect to the nature of the employment, the duration of the period of restraint, and the scope and extent of the restriction, territorially.

134 So.2d at 444 (citations omitted).

Discussing the role of the court in this equation, the court in *Donahoe* further stated:

It is the law's function to maintain a reasonable balance in this area. This requires us to recognize that there is such a thing as unfair competition by an ex-employee as well as by unreasonable oppression by an employer. The circumstances of each case will be carefully scrutinized to determine whether it falls

within or without the boundary of enforceability.

134 So.2d at 445 (citations omitted).

Therefore, to establish a substantial likelihood of success on the merits of its claim, Cordis must demonstrate the economic justification and the reasonableness, relating to both duration and geographical scope, of the restraint.

This court is of the opinion that Cordis sustained its burden of demonstrating the economic justification for its agreement with Taylor. In the pacemaker sales industry the customers, in most cases the physicians, rely primarily on the salesperson and have little or no contact with the company prior to purchasing a pacemaker. Throughout the period during which Taylor was in training, and later when he was establishing his and Cordis' credibility with the physicians, Cordis paid all his salary and expenses. Under similar circumstances, the Mississippi Supreme Court has stated that

it is proper for the court to take into consideration the fact that [the employer] spent large sums of money over a period of time to establish the business and acquire the customers.

*Redd Pest Control Co. v. Heatherly,* 248 Miss. 34, 157 So.2d 133, 136 (1963). *See also Texas Road Boring Co. of Louisiana-Mississippi v. Parker,* 194 So.2d 885, 889 (Miss.1967). In the specific context of the pacemaker sales industry, various federal courts have upheld non-competition covenants against challenges by ex-employees, citing the peculiar nature of the business. In *Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085 (D.Minn.1981), *aff'd* 684 F.2d 565 (8th Cir.1982), the district court stated:

Due to the heavy reliance of implanting physicians on the skill and advice of pacemaker sales representatives, the sales representative naturally becomes closely identified with the manufacturer. A symbiotic relationship develops between the sales representative and manufacturer. The skills of the sales representative enhance the reputation of the manufacturer, while at the same time the quality

of the product and training provided by the manufacturer to the sales representative enhance the reputation and skills of the sales representative. Medtronic has a legitimate business interest in protecting the goodwill it provides for its sales representatives and in the goodwill created for it by its sales representatives during their employment. When a sales representative leaves its employ, Medtronic needs some time to hire, train and place in the field a substitute sales representative. If the departing sales representative were to work for a competitor and immediately call on the same customers, Medtronic would be at an unfair competitive disadvantage.

527 F.Supp. at 1091–92. *See also Medtronic, Inc. v. Janss,* 729 F.2d 1395, 1400 (11th Cir.1984).

The one-year prohibition in paragraph 4 of the agreement is also supported by the proof, as such period is required for Cordis to hire, train and place in the field a new sales representative. *See Gibbons,* 527 F.Supp. at 1094; *Janss,* 729 F.2d at 1400 (360-day prohibition of contact with former pacemaker customers reasonable).

■ Two questions remain. As stated, the non-competition agreement in Taylor's contract of employment contains no specifically designated geographic territory. The temporary restraining order entered by the court in this cause applied the prohibition to all of Mississippi less the six gulf coast counties. There was conflicting evidence adduced at trial, however, concerning which cities and counties in northern Mississippi were in Taylor's territory. Contrary to the contention of Taylor, the fact that the scope of the territory to which the non-competition agreement would apply was not precisely defined *geographically* does not void the agreement. Under such circumstances, the court may reform the scope of the agreement to cover a reasonable area wherein Cordis can prove the economic justification for its restraint, and excise any area wherein the restraint is not supported by economic justification and is therefore unreasonable. *Hensley v. E.R. Carpenter Co., Inc.,* 633 F.2d 1106, 1110

(5th Cir.1980); *Redd Pest Control Co. v. Heatherly,* 248 Miss. 34, 157 So.2d 133, 135–36 (1963). Based upon a review of the evidence, the court concludes that Cordis has sustained its burden of establishing a likelihood of success only as to those physicians, and the medical groups with which they practice, to whom Taylor sold Cordis products during his employment with Cordis.

The names of those physicians, except for Dr. Earl Fyke, are set out in defendant's exhibit 28, which lists Cordis customers as of February 21, 1986, three days after Taylor resigned. The physicians are:

| PHYSICIAN | CITY |
| --- | --- |
| Robert J. Cole | Amory |
| William Oakes | Amory |
| John J. Cook | Brandon |
| George Schimmel | Brandon |
| Calvin L. Schuster | Brandon |
| Donald Taylor | Brandon |
| John W. Prather | Corinth |
| John Alford | Greenwood |
| Raymond W. Browning | Greenwood |
| Brett Person | Greenwood |
| Thomas S. Messer | Hattiesburg |
| William A. Whitehead | Hattiesburg |
| Albert B. Britton | Jackson |
| W. T. Rueff | Jackson |
| Henry B. Tyler | Jackson |
| Starkey Hudson | Jackson |
| M. P. Smith | Jackson |
| Harold Conn | Jackson |
| James L. Crosthwait | Jackson |
| Tellis B. Ellis | Jackson |
| Thomas D. Paine | Jackson |
| William Rosenblatt | Jackson |
| Harvey Sanders | Jackson |
| Malcolm Taylor | Jackson |
| R. Rex Applewhite | Laurel |
| Robert J. Berg | Laurel |
| Thomas R. Howell | Laurel |
| John M. McRae | Laurel |
| Kamlesh D. Nayak | Laurel |
| James A. Pittman | Laurel |
| Cecil T. Williams | Laurel |
| Harry G. Causey | Meridian |
| W. F. Easley | Meridian |
| James Gleaves | Meridian |
| David Makey | Meridian |
| James C. Matthews | Meridian |
| Leslie V. Rush | Meridian |
| Edward G. Scott | Meridian |
| Mallan G. Morgn | Natchez |
| Eugene E. Taylor | Natchez |

| PHYSICIAN | CITY |
|---|---|
| Thomas F. Barkley | New Albany |
| Bruce A. Bullwinkel | New Albany |
| Joe R. Bungardner | Starkville |
| Ben F. Sanford | Starkville |
| Frank A. Nichols | Tupelo |
| Samuel C. Pace | Tupelo |

The prohibition is not geographically based and is not intended to encompass the particular cities in which the above-named physicians practice. The prohibition does not extend to those physicians, unless they are or were during Taylor's employment with Cordis partners with the above-named physicians, to whom Taylor might have attempted to sell Cordis products but was unsuccessful. Cordis has urged the court to enforce the agreement as to all physicians on whom Taylor called while with Cordis, but no evidence was adduced indicating the names of those physicians or that Taylor was close to making a sale to any such physicians. In the absence of such evidence, the court declines to speculate as to the existence *vel non* of such prospective customers. As stated in the agreement, the prohibition extends to the sale of *any* medical product, not restricted to pacemakers, which has a counterpart and is competitive with any product in the Cordis product line.[4]

Paragraph 4 of the agreement states in part that Taylor "will not contact or solicit any of the customers, clients or leads with whom you have had contact during your employment by Cordis...." The court is of the opinion that a reasonable interpretation of the term "contact" in the agreement prohibits Taylor from accepting and responding to calls from the above-named physicians relating to the need for a pacemaker and an impending surgical implant procedure or to any aspect of the pacemaker industry. There was evidence that on at least two occasions since leaving Cordis Taylor has received and responded to calls from former Cordis pacemaker customers. Taylor told the inquiring physician that he was no longer with Cordis, that the physician could call Gerald Thompson to purchase a Siemens or Pacesetter pacemaker, and that he would be available to assist in surgery. The agreement also prohibits Taylor from supplying physicians with the name of salespersons of competing companies. Cordis has adduced sufficient evidence of economic justification and reasonableness underlying its non-competition agreement for this court to block this potential end run on the prohibition.

The court concludes that the agreement, as reformed, in Taylor's contract of employment with Cordis is supported by economic justification and is reasonable to the extent required by the first criterion of the *Canal Authority* test.

IRREPARABLE INJURY

The evidence clearly showed that Cordis will suffer irreparable harm if Taylor is allowed to transfer the goodwill he has developed on behalf of Cordis to Cardio-Life. Cordis' experience with Robert Poole, a sales representative unhindered by a non-competition agreement who took approximately eighty percent of Cordis' business in his sales when he transferred to a competitor, shows the level of harm which can be inflicted in the absence of such restraint. Money damages for such a loss would be virtually impossible to compute, and equitable relief is proper in the absence of an adequate remedy at law. Indeed, paragraph 7 of the agreement states that "you acknowledge that a lawsuit for dam-

---

**4.** Cordis urged at trial that paragraph 1 of the non-competition agreement should be interpreted to prohibit sale by Taylor of *any* medical supplies, whether or not such supplies are competitive with or have counterparts in the Cordis products line, for a period of six months. Paragraph 1, however, contains a prohibition of association with an enterprise that promotes medical supplies "in competition with Cordis." The law demands strict construction of such agreements, and the court is not free to extend the prohibition beyond that stated in an otherwise reasonable agreement. Therefore, Taylor should be barred from contacting the above-named physicians covering the sale of any product *in competition with* Cordis. Barring him from associating with any medical supplies enterprise which might sell a product in competition with Cordis for six months is unsupported by any legitimate economic justification by Cordis and is therefore unreasonable and unenforceable.

ages for any of the provisions of this agreement will be inadequate and agree that Cordis is entitled to injunctive relief in case of such breach." Taylor signed the agreement. Additionally, the proof regarding the peculiar nature of the pacemaker sales industry further established that a manufacturer suffers the threat of irreparable injury whenever a salesman opts to transfer his portion of the goodwill to another company. *See Medtronic, Inc. v. Gibbons*, 527 F.Supp. 1085, 1091–92 (D.Minn.1981). Accordingly, the court is of the opinion that Cordis has carried its burden of showing that an injunction is necessary to prevent irreparable injury to Cordis.

## BALANCE OF THE HARM

In order to satisfy this element of the *Canal Authority* test, Cordis has the burden of proving that the threatened injury to it in the absence of the competitive prohibition outweighs the harm that enforcing the agreement would do to Taylor. Cordis has shown that its threatened injury includes loss of goodwill, loss of sales and severance of relationships with physicians and hospitals in Taylor's territory. Taylor counters that enforcing the non-competition agreement through issuance of an injunction will cause irreparable harm to his business relationships with his Mississippi customers, developed over a long period.

As reformed, the non-competition agreement is narrowly drawn. It does not prevent Taylor from carrying on active sales business with any Mississippi physicians not named above. Taylor remains free to offer Cardio-Life products to all other physicians in any city in Mississippi or elsewhere. Furthermore, Joe Melancon, the owner of Cardio-Life, testified by deposition that Taylor will receive advance commissions on sales of Cardio-Life products should the non-competition agreement be enforced. Thus, the threatened injury to Cordis far outweighs any potential harm to the business reputation or the livelihood of Taylor. The court is of the opinion that the balance of the harm weighs in favor of granting Cordis' motion for preliminary injunction. *See Medtronic, Inc. v. Gibbons*, 527 F.Supp. at 1094–95.

## PUBLIC INTEREST

Cordis argues that this last element of the *Canal Authority* test—that granting the preliminary injunction will not disserve the public interest, 489 F.2d at 572—is easily satisfied because there is no proof that those patients who are or will be in need of a pacemaker will be deprived because of Taylor's absence from the pacemaker sales field. This is beyond dispute. Taylor contends, however, citing *Thames v. Davis & Goulet Insurance, Inc.*, 420 So.2d 1041 (Miss.1982), that the public interest will be disserved by restricting free and open competition among product manufacturers. The court concludes that restraining Taylor under the limited scope of the reformed agreement will not seriously affect competition in the pacemaker sales industry. As was stated in *Medtronic, Inc. v. Gibbons*, 527 F.Supp. at 1095:

> Although Gibbons does perform some beneficial public services by taking part in surgeries and giving seminars, he is primarily a salesman, not a doctor or an educator. His activities contribute to improving the quality of health care, but his temporary absence from a portion of his sales area would not seriously deteriorate the quality of health care in that area.

While Taylor has raised a significant question as to whether the public interest will be best served by restricting free competition, the Mississippi Supreme Court, the decisions of which this court is *Erie*-bound to follow, has determined on a number of occasions that a reasonable covenant not to compete is enforceable to protect the interest of the former employer. Therefore, this court is of the opinion that issuance of a preliminary injunction in this cause will not disserve the public interest.

## CONCLUSION

■ The court recognizes that the development of Cordis' goodwill among physicians in Mississippi was due in no small part to the efforts and ability of Dan Taylor. Taylor brought to Cordis over eleven years of experience in medical supplies sales, the great majority of which was in

Mississippi. It cannot be denied with any candor that Taylor also brought with him to Cordis the foundational relationships with many Mississippi physicians which directly led to sales of Cordis products. The court has attempted to reform and limit the non-competition agreement to reflect a truer balance between Taylor's interest in professional credibility and Cordis' interest in maintaining the legitimate goodwill developed in its behalf and at its expense. It appears, however, that Taylor is in a position to lure former Cordis customers to Cardio-Life products, and in fact has done so since leaving Cordis. Under these circumstances, and based upon the evidence adduced at trial, the court is of the opinion that issuance of a preliminary injunction is necessary to protect Cordis.

Accordingly, it is ordered that for a period of one year, beginning on February 18, 1986, Daniel J. Taylor shall not solicit or accept contact in any manner, including receiving calls, any of the physicians whose names appear previously in this opinion for the purpose of sales of any medical products or services in competition with Cordis. Taylor is also enjoined from assisting any other person in soliciting or contacting the physicians named previously for the purpose of sales of products in competition with Cordis.