NATIONAL TRAINING FUND FOR the SHEET METAL AND AIR CONDITIONING INDUSTRY and Houston Area Sheet Metal Joint Apprenticeship Committee, Plaintiffs,

v.

Zane MADDUX, Defendant.

Civ. A. No. H–89–3129.

United States District Court, S.D. Texas, Houston Division.

Nov. 16, 1990.

Patrice M. Flynn, Houston, Tex., for plaintiffs.

## OPINION ON REIMBURSEMENT

HUGHES, District Judge.

1. *Introduction.*

The National Training Fund for the Sheet Metal and Air Conditioning Industry and the Houston Area Sheet Metal Joint Apprenticeship Committee have sued Zane Maddux to recover the cost of his training. Maddux went to work for a noncontributing employer, and under the training contract's work-or-pay term, he owes the Funds. The worker complains that it is against public policy to require him either to work for a company that paid for his education or to repay the cost of his training himself. Maddux must pay.

## 2. Background.

The national and local apprenticeship training Funds for the sheet metal and air conditioning industry are Taft–Hartley trusts and are governed by ERISA. Zane Maddux was an apprentice and participant who received training by the Funds. 29 U.S.C. § 186(c)(5); 29 U.S.C. § 1001 et seq.

Around 1984, the Funds began a loan program in which apprentices, like Maddux, agreed to repay the Funds the cost of training in cash or by in-kind credits. An apprentice can earn in-kind credits and repay his loan by continuing his employment with a contractor that contributes to the Funds. If the apprentice works for a non-contributing employer, after receiving the benefit of the training, the apprentice is required to repay the cost of training in cash.

Between 1984 and 1987, Zane Maddux voluntarily signed several agreements and received the apprenticeship training. Later, in April of 1989, Maddux accepted employment with McCorvey Sheet Metal Works, a company in the sheet metal and air conditioning industry that did not contribute to the Funds. Maddux continued to use his training to benefit himself and this non-contributing employer. Under the loan agreements, Maddux became indebted to the Funds in cash.

## 3. Public Policy.

■ Maddux asserted in his answer that the agreements are illegal as being against public policy. Maddux's position was correct at common law. All restrictions placed on a departing employee were void as a restraint of trade. See Annotation, Covenants to Reimburse Former Employer for Lost Business, 52 A.L.R. 4th 139 (1987).

As society has become more mobile and the workplace more technical, workers may agree that they will reimburse the company or union for valuable training, but only up to the line of recompense. Contractual punishment is still barred.

Doubtless an employer who has provided specialized training to an employee—as by a course of studies or the like—might reasonably contract with the employee for reimbursement if the employee should quit before the employer achieves any benefit. However, the employer may not require its ex-employee to make payment to it unrelated to the employer's damage, simply as a penalty to discourage or punish a job change. *Wilson v. Clarke*, 470 F.2d 1218 (1st Cir. 1972).

The spectre of a contract against public policy does not fit the facts, but the enforcement of these contracts does implicate an important public interest. Without contracts to structure the economic benefits, society would be less productive because neither the unions nor employers would risk investing the addition of skills to employees who were not required to earn part of their training cost back by working for the unions and companies. In the absence of a lawful method to prevent the worker and competing contractors from obtaining a free ride, the Funds and related employers would simply not train workers leaving everyone the loser.

As an analogy, when a worker leaves he cannot take his uniform and tools to his employer's competitor, but skill, once bestowed on a worker is unrecoverable and transportable. Reimbursement by a beneficiary, if bargained for fairly, only places the parties somewhere near their starting points. *See United States v. Barry*, 904 F.2d 29 (11th Cir.1990) (A doctor whose schooling was paid by the American taxpayers was obliged to repay the loan or to serve those who educated him for four years in a public health program, as he agreed.)

## 4. Conclusion.

These national training Funds are not charities, giving away their resources. The Funds train a limited number of people who will directly benefit the members. The purpose of the contract is not to enslave the employees. The reimbursement prevents freeloading by neighboring competitors. Because they do not pay for the program, they can pay workers slightly more than the members can at the same

total cost. The public is best served by enforcement of a reasonable reimbursement provision.

Without a check on freeloading by non-participating companies, the Funds would not have trained Maddux. The work-or-pay provision is what allowed Maddux to acquire his new skill. The reimbursement makes a non-participating employer equal to a participating employer if he pays the reimbursement, either in the form of a lump sum or a higher salary to get the trained worker.

The Funds are also entitled to attorneys' fees and costs under the loan agreements and ERISA. 29 U.S.C. § 1132(g)(1).