MYERS, P.J.,
Concurring in Part and Dissenting in Part:
¶ 65. While I concur with the result reached by the majority on issue two, I must dissent from the majority’s decision to reverse the circuit court’s judgment on issue one.
¶ 66. The jury awarded BCI $1,000 in compensatory damages for breach of the BPA without any proof that BCI suffered any cognizable harm from Banks’s employment with Venture or from Banks’s retention of certain property items, all of which were returned to BCI,[2] or from Banks’s disclosure of so-called confidential information — i.e., the BPA, itself, and the industry-standard, boilerplate language contained therein.[3]
¶ 67. In its pleadings, BCI claimed that Banks’s breach of the BPA caused it to suffer loss of business and loss of goodwill. BCI suffered neither, as Thomas Hinds, BCI’s President, and Tony Bailey, BCI’s owner, illustrated for the record at trial.
Hinds:
Q. Can you tell this jury one single unfair competition advantage that [Venture] has gotten as a result of [Banks] going to work there?
*20 A. I don’t know of any.
Q. You didn’t know in March of 2006 [when this lawsuit was filed], did you?
A. No, I didn’t.
Q. And you don’t know today, do you?
A. Correct.
Q. BCI’s interest in protecting itself from unfair competition has not been harmed by [Banks’s] employment at [Venture], has it?
A. I can’t say that it has.
Q. Now, other than simply not wanting [Banks] to go work for Venture, which he could quit ... and go somewhere, what is it about the fact that he went to work for Venture that has caused you [BCI] any monetary damage?
A. I don’t know of any.
Q. It’s been two-and-a-half years now. If you don’t know today, how are you going to know[?]
A. I’ve told you the same answer, I don’t know.
Q. BCI is not a manufacturer of anything, are they?
A. No, we’re not.
Q. BCI doesn’t hold any patents or has [sic] any trade secrets.... ?
A. No, we don’t.
Q. So you’re basically selling Cisco products and installing them and servicing them?
A. That’s correct.
Q. Now, you admit that BCI has not lost any customers, correct?
A. Not to my knowledge.
Q. I’m not trying to imply that that’s a bad thing, but because of what you do, BCI is not the kind of company that would have trade secrets.
A. That’s correct.
Q. In fact, probably [ninety percent] or more of the information related to the sales, servicing, installation and so on of Cisco products is available to any Cisco seller, right, distributor?
A. Correct.
Q. Now, you mentioned something about the silver certification through Cisco, but BCI never lost the benefit of that, did it?
A. We did not.
Q. In fact ... I believe that BCI has gone from silver to gold since [Banks] left?
A. That’s correct.
Q. So [Banks’s] leaving certainly didn’t hurt you in that regard, did it?
A. No. We had to spend a lot of time and resources getting other people trained to take his spot.
Q. That’s right. And you would have had to incur those time and expenses whether he left to go work for Venture or if he’d left to go farm, correct?
A. Correct.
Q. So how is it that his leaving has caused you to incur that[?]
A. Because he went to go work for a competitor, we look at it — we ended up incurring things that normally we wouldn’t have incurred.
Q. Like what?
A. We had a very- short period of time to get people trained and attaining that certification which is normally a much longer period of time than six months.
Q. But my question is why his quitting and going to work for Venture, how that caused you to incur those expenses and *21 how that would have been any different had he just quit and retired?
A. If he [had] quit and retired, it wouldn’t have been any different.
Q. So ... if he went to go farm with a cousin in the Delta, you would have incurred the very identical expenses that you’re asking this jury to reimburse you for?
A. That’s correct.
Q. You have mentioned some documents and so on that [Banks] took with him and that we’ve returned to you. Do you know the specifics of those documents?
A. I know there — some printed documents that I’ve seen are vendor lists, customer work orders — I’m trying to recall what the other ones were.
Q. My question to you, though, is his taking those documents, which we don’t know what they are because we don’t have them, that has not harmed BCI in any way, has it?
A. We don’t know that it has.
Q. That hasn’t harmed BCI, has it?
A. Not that we know of.
Bailey:
Q. Do you have any evidence whatsoever that any action taken by [Banks] caused you to lose any customers?
A. No.
Q. Do you have any evidence ... that [Banks] has disclosed any of your business practices information that you would consider confidential to anyone? A. Absolutely. He showed our [BPA] all over the world.
Q. You know, that’s interesting that you say that because BCI allowed him to take that agreement. Your talking about the BPA, right?
A. Sure, to our biggest competitor.
Q. BCI allowed him to take that agreement to have his father-in-law look at it?
A. Sure, an attorney, but not to our biggest competitor. Two of them actually, Bell South [sic] and Venture.
Q. The truth is there isn’t any proof that you have that you have been harmed as a result of [Banks’s] actions?
A. The only evidence is we [have] spent a lot of time and money trying to defend [sic] something, and I go back to the point that I know he took some things, and we have been harmed from dealing with this in time, money, and effort. So, yes, we have been harmed, but maybe not in the way that [you’re] talking about.
Q. Monetary damages.
A. Yeah.
Q. I believe you testified to the fact that the business has grown maybe [thirty] percent a year?
A. Yes.
Q. That’s been since [Banks] left, correct?
A. Correct.
Q. So Banks’s leaving and going to work for Venture did not cause your business to not to [sic] continue to develop?
A. No, it did not.
¶ 68. Non-competition covenants are not favored in the law, as they are considered restrictive contracts that restrain trade and individual freedom. Frierson v. Sheppard Building Supply, Co., 247 Miss. 157, 172, 154 So.2d 151, 156 (1968); Thames v. Davis & Goulet Ins., Inc., 420 *22 So.2d 1041, 1043 (Miss.1982). The Mississippi Supreme Court has also recognized that there is a “valid and accepted distinction between covenants not to compete in an employer-employee setting, and those dealing with the sale of a business[.]” Cooper v. Gidden, 515 So.2d 900, 905 (Miss.1987) (citation omitted); see also Herring Gas Co. v. Whiddon, 616 So.2d 892, 897 (Miss.1993) (noting the same distinction). “[A] purchaser is entitled to protect himself against competition on the part of the vendor, while the employer is not entitled to protection against mere competition on the part of a servant.” Id. (quoting 46 A.L.R.2d, p. 144 (1956)) (emphasis added). Further, a non-competition agreement is likely to affect an employee’s means of procuring a livelihood for the employee and his or her family more so than that of a seller who usually receives adequate consideration from the sale of his or her business. M[4]
¶ 69. Our courts, however, will enforce such agreements if there is shown to be a reasonable basis for the covenant, necessary for the protection of the employer, and which does not impose undue hardship on the employee or the public. Donahoe v. Tatum, 242 Miss. 253, 259, 134 So.2d 442, 444 (1961) (citation omitted). The determination of reasonableness depends upon the competing needs of the parties as well as the needs of the public. These needs are: (1) the employer’s need to protect legitimate business interests (Redd Pest Control v. Heatherly, 248 Miss. 34, 44, 157 So.2d 133, 136 (1963)); (2) the employee’s need to make a living (Empiregas, Inc. of Kosciusko v. Bain, 599 So.2d 971, 976 (Miss.1992)); and (3) the public’s need to secure the employee’s presence in the labor pool and guard against monopolies (Wilson v. Gamble, 180 Miss. 499, 510-11, 177 So. 363, 365 (1937)).
¶ 70. The employer bears the burden of proving the reasonableness of the agreement and must “demonstrate to the trial court the economic justification, the reasonableness, of the restraint which is sought to be imposed.” Empiregas, 599 So.2d at 976 (quoting Thames, 420 So.2d at 1043). “The facts of each case will be carefully examined as to the reasonableness of such [agreements].” Donahoe, 242 Miss, at 261,134 So.2d at 445.
¶ 71. The general recognition among authorities is that an employer is not enti- *23 tied to protection against ordinary competition from a departing employee. 54A Am.Jur.2d Monopolies and Restraints of Trade § 905 (2009).[5] In Donahoe, the supreme court implicitly acknowledged as much when it spoke of “unfair competition” on the part of ex-employees and instructed that the validity of the agreement is dependant, in part, upon the nature and character of the employment. See Donahoe, 242 Miss, at 259-61, 134 So.2d at 444-45.
¶ 72. Donahoe is distinguishable from the instant case in that the question there was whether the chancellor erred by enjoining an employee from working for a competitor of the former employer for the period of time stated in the employee’s contract. Id. at 256, 134 So.2d at 442-43. The supreme court agreed with the chancellor’s finding that based on the nature and character of Barbara Donahoe’s employment with Rudy Tatum’s company, Donahoe’s continued employment with Tatum’s competitor would prejudice Tatum’s business interests. Id. at 259,134 So.2d at 444. Although the supreme court did not expressly say so, one can readily infer that the supreme court meant “unfair competition” by its use of the word prejudice. Otherwise, it would have been pointless for the supreme court to make mention of the fact that Donahoe knew of Tatum’s “business methods, confidential information, and trade secrets,” and then reason that, if such information were “brought to the knowledge” of Tatum’s competitor, it “would prejudice the interests of [Tatum].” Id.
¶ 73. Based on my interpretation of the controlling case law in this state, if the purpose of a non-competition agreement ancillary to an employment contract is to prevent ordinary competition, the covenant is unreasonable and unenforceable. See Cooper, 515 So.2d at 905; see also Thames, 420 So.2d at 1043 (holding that an employer was not entitled to injunctive relief where the employer merely offered the contract and proof as to its violations, but it did not offer proof as to the reasonableness and necessity of the contractual prohibition). And if my interpretation is accurate, then I think it would be counter-intuitive to not require an employer to demonstrate “unfair competition” on the part of an ex-employee when seeking compensatory damages for an ex-employee’s *24 alleged breach of a non-competition agreement.[6]
¶ 74. In interpreting Thames, the federal district court in Taylor v. Cordis Corp., 634 F.Supp. 1242, 1247-48 (S.D.Miss.1986), said:
The Mississippi Supreme Court has held that certain non-competition agreements are valid and enforceable. See, e.g., Do-nahoe [,] ... 242 Miss. 253, 134 So.2d 442.... The court has recognized, however, that such an agreement “restricts the exercise of a gainful occupation [and] is a restraint of trade.” Accordingly, the Mississippi courts require more than[:]
the fact that an employer has a written agreement that the employee will not, on leaving his employment, compete with his employer, that the employee breaks that agreement, that the employee quits his employer, that the employee starts working for a rival, and that the rival thereby becomes a more efficient competitor
to enforce a non-competition agreement. Thames [,] ... 420 So.2d [at 1043]. The court carefully scrutinizes the particular circumstances of each case to maintain a reasonable balance between “unfair competition by an ex-employee [and] unreasonable oppression by an employer.” Donahoe[,] ... 242 Miss. 253, 134 So.2d [at] 445[.]
The district court enforced the non-competition provision at issue in the case based on a finding that the employer “sustained its burden of demonstrating the economic justification for its agreement with [the former employee].” Id. at 1248. The district court held:
The court has attempted to reform and limit the non-competition agreement to reflect a truer balance between [Daniel] Taylor’s interest in professional credibility and Cordis’[s] interest in maintaining the legitimate goodwill developed in [sic] its behalf and at its expense. It appears, however, that Taylor is in a position to lure former Cordis customers to Cardio-Life products, and in fact has done so since leaving Cordis. Under these circumstances, and based upon the evidence adduced at trial, the court is of the opinion that issuance of a preliminary injunction is necessary to protect Cordis.
Id. at 1252.
¶ 75. Here, unlike the plaintiff in Dona-hoe (or the plaintiffis) in each of the cases cited by the majority), BCI agreed to in-junctive relief that allowed Banks to continue to work for Venture. BCI then sought damages for the “loss of business and loss of goodwill” it alleged resulted from Banks’s breach of the BPA. At trial, BCI admitted that no “unfair competition” resulted from Banks’s employment with Venture. BCI also made no effort to demonstrate how Banks’s retention of BCI’s property items and/or Banks’s disclosure of the BPA to BCI’s competitors harmed BCI’s business interests. BCI did not even demonstrate how it was harmed so-called monetarily.
¶ 76. Nevertheless, BCI now claims on appeal that it had a “protectable interest” in the training and education it provided to Banks. While I agree with the majority that our courts have before taken such factors into consideration when assessing the reasonableness and necessity of non- *25 competition agreements, I know of no Mississippi decision that has held a non-competition agreement valid and enforceable based solely on an employer’s investment in the training and education of an employee.
¶ 77. The United States Court of Appeals, First Circuit, addressed a similar argument put forth in the case of Wilson v. Clarke, 470 F.2d 1218 (1st Cir.1972). There the court said:
In cases of agreements forbidding an employee to engage in the same business or line of activity as the employer, attention is often given to whether the agreement is reasonably limited as to area and duration. But such considerations are merely aspects of the rule ■... that the agreement must be no wider than is necessary to afford reasonable protection to the employer. A further, and here more relevant, aspect of the rule is that an employer may not enforce limitations on an ex-employee’s engaging in activities which do no damage to the employer.
[[Image here]]
Perhaps because it recognizes the absence of damage based on unfair competition, [the former employer] stresses its damages allegedly suffered by losing a valuable employee whom it had trained. (This damage would, of course, be the same had [Alan] Clarke left to go work for a non-client instead of for a client or prospective client. It would likewise be the same whether he found employment as a psychologist or in some other capacity.)
An employer’s right, however, to place future burdens on an employee merely to forestall or offset the loss of his services is clearly limited:
An employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment. The employee may achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer. As was said in Herbert Moris, Limited, v. Saxelby, 1916 1 A.C. 688, at 714: “A man’s aptitudes, his skill, his dexterity, his manual or mental ability ... ought not to be relinquished by the servant; they are not his master’s property; they are his own property; they are himself.”
Id. at 1221-28 (citation omitted).
¶ 78. In National Training Fund v. Maddux, 751 F.Supp. 120 (S.D.Tex.1990), the district court upheld an apprenticeship agreement, somewhat similar to the 2001 RCA that Banks expressly agreed to at the beginning of his employment with BCI. But in so doing, the United States District Court, S.D. Texas stated the following:
As society has become more mobile and the workplace more technical, workers may agree that they will reimburse the company or union for valuable training, but only up to the line of recompense. Contractual punishment is stilled barred.
Doubtless an employer who has provided specialized training to an employee— as by a course of studies or the like— might reasonably contract with the employee for reimbursement if the employee should' quit before the employer achieves any benefit. However, the employer may not require its ex-employee to make payment to it unrelated to the employer’s damage, simply as a penalty to discourage or punish a job change.
*26 Id. at 121 (quoting Wilson, 470 F.2d at 1223).
¶ 79. As Banks points out on appeal, in each case cited by BCI on this point, there was additional evidence presented in support of the employer’s economic justification for the covenant. In Redd Pest Control Co., Inc. v. Foster, 761 So.2d 967, 973 (¶23) (Miss.Ct.App.2000), the former employer provided testimony that it had lost over one hundred customers and submitted evidence of a projected two-year loss of profits of $50,400, as a result of that loss of business. In Taylor, as mentioned, there was evidence that the ex-employee could (and did) lure clients away from his former employer. Taylor, 634 F.Supp. at 1252. In Texas Rd. Boring Co. of Louisiana-Mississippi v. Parker, 194 So.2d 885, 889 (Miss.1967), “the defendant copied a part of complainant’s machinery, hired his former employer’s personnel, and contacted the same customers he had met and become acquainted with while in the employ of the complainant in order to promote his own business....” In Heatherly, evidence was presented that the ex-employee had solicited his former employer’s customers, which resulted in the former employer losing many of its customers to the ex-employee’s new employer. Heath-erly, 248 Miss, at 41, 157 So.2d at 135.
¶ 80. Here, the evidence showed that Banks is not in the customer-procuring business. While he worked closely with some of BCI’s customers, he did so as a problem solver, and he usually was shadowed by one of BCI’s sales representatives. When Banks went to work for Venture, not one of BCI’s customers followed. Nor was it shown that Banks attempted to lure one of BCI’s customers over to Ve-nure, or one of BCI’s remaining engineers.
¶ 81. The evidence also showed that BCI and Venture (and BellSouth for that matter) are downstream suppliers of Cisco products. Cisco requires its suppliers to remain up-to-date on its latest technology. The training that BCI’s engineers receive is the same training the engineers of its competitors receive. Thus, the training Banks received while employed at BCI was not unique.
¶ 82. Banks claims on appeal that because BCI knew that it could not demonstrate that he harmed any “protectable interest” under the BPA, BCI asserted, for the first time at trial, a separate breach-of-contract claim. Unquestionably, most of the trial concerned the 2005 RCA, an unsigned reimbursement agreement printed on page thirty-five of BCI’s 2005 employee handbook, which has a “perpetual” element to it that, seems to me, runs — at the very least — counter to Mississippi’s employment-at-will doctrine.[7],[8] That said, what I find well based about Banks’s argument in relation to this issue, is that Hinds admitted that the expenses BCI sought to recoup as damages for Banks’s breach of the 2005 RCA were not connected to the BPA. The following testimony, which is mentioned in the majority’s *27 discussion of the 2005 RCA in issue two, provides:
Q. So you’re telling this Court and jury that you are seeking this reimbursement for [Banks] irrespective of what his post-employment conduct is?
A. Correct.
Q. And it is not connected with the [BPA]?
A. I don’t know that I would draw the two together related to that.
¶ 88. The trial court reached the right result in this ease. Not only is the record without proof to support the jury’s award of $1,000 in compensatory damages awarded to BCI, it plainly reveals that BCI failed to demonstrate the reasonableness of the BPA. Accordingly, I would affirm the circuit court’s decision to grant a JNOV in favor of Banks on BCI’s breach-of-contract claim for damages regarding the BPA.
IRVING, J., JOINS THIS OPINION.

. None of the property items were presented at trial. According to the record, BCI’s attorney was still in possession of some of the items at the time of trial.

. "[M]atters of general knowledge within the industry are not classified as trade secrets or confidential information entitled to protection." 54A Am.Jur.2d Monopolies and Restraints of Trade § 913 (2009).

. In the landmark case of Arthur Munay Dance Studios of Cleveland v. Witter, 105 N.E.2d 685, 704 (Ohio Law Abs.1952), which was also recognized by our supreme court in Thames, 420 So.2d at 1043, for its comprehensive discussion of this area of the law, Judge Hoover explained:
The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate [sic] restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business. He is more apt than the seller to be coerced into an oppressive agreement. Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training. The seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is a part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought. Usually the employee gets no increased compensation for agreeing to the abstention; it is usually based on no other consideration than the employment itself.

. Arkansas: Statco Wireless, LLC v. SW. Bell Wireless, 80 Ark. App. 284, 95 S.W.3d 13, 21 (2003) ("[T]he law will not enforce a [non-competition] contract that merely prohibits ordinary competition."). Kansas: Allen, Gibbs & Houlik, L.C. v. Ristow, 32 Kan. App.2d 1051, 94 P.3d 724, 726 (2004) (“If the sole purpose is to avoid ordinary competition, [a non-competition agreement] is unreasonable and unenforceable.”). Massachusetts: Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 310 N.E.2d 915, 920 (1974) ("Protection of the employer from ordinary competition ... is not a legitimate interest.”). Missouri: Healthcare Servs. of the Ozarks, Inc. v. Copeland, 198 S.W.3d 604, 610 (Mo.2006) (Non-compete agreements "are not enforceable to protect an employer from mere competition by a former employee.”). Ohio: Westco Group, Inc. v. City Mattress, 1985 WL 144712, at *3 (Ohio Ct.App.1991) ("The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer’s legitimate interests by preventing unfair competition — not ordinary competition.”). Oklahoma: Cardiovascular Surgical Specialists, Corp. v. Mammana, 61 P.3d 210, 213 (Okla.2002) ("only ‘unfair competition’ on the part of a former employee is the legitimate focus of a covenant not to compete”). Tennessee: Fadalla v. Life Auto. Prods., 2007 WL 2746940, at *3 (W.D.Tenn.2007) ("An employer ... cannot by contract restrain ordinary competition."). Wisconsin: Wausau Med. Ctr., S.C. v. Asplund, 182 Wis.2d 274, 514 N.W.2d 34, 39 (1994) (“An employer is not entitled to be protected against legitimate and ordinary competition of the type a stranger could give.”).

. Contrary to BCI's argument on appeal, Banks did indeed try to submit a jury instruction, which would have instructed that non-competition agreements are unenforceable if they seek merely to avoid fair competition in the marketplace. But BCI objected to it on the ground that no evidence was presented that BCI has a "monopoly.” Accordingly, the circuit court disallowed the instruction.

. As Banks points out in his brief, unlike ordinary reimbursement agreements, which are limited in duration, the terms of the 2005 RCA put an at-will employee in the "perpetual” position of either having to (1) pay to leave or (2) stay employed with BCI.

. Based on my calculations of the numbers provided in Hinds’s testimony, Banks potentially could have been looking at reimbursement costs of $51,703.60. This is based on Hinds’s testimony that BCI’s engineers may spend up to twenty-five percent of their work-time each week (10 hours per week) in training. This comes to 520 hours per year. Multiply that times the so-called "hourly rate costs” with "overhead” ($99.43) that BCI claimed was lost at the expense Banks's training sessions in the months prior to Banks’s departure.