761 So.2d 967 (2000)
REDD PEST CONTROL COMPANY, INC., Appellant,
v.
Wayne FOSTER and Isadore Smith, Appellees.
No. 98-CA-00755-COA.
Court of Appeals of Mississippi.
June 13, 2000.
*969 Robert O. Allen, Sally Burchfield Doty, Brookhaven, Attorneys for Appellant.
Ralph L. Peeples, Brookhaven, Attorney for Appellees.
BEFORE MCMILLIN, C.J., LEE, MOORE, JJ.
LEE, J., for the Court:
¶ 1. Redd Pest Control Company, Inc., filed an action against former employees, Wayne Foster and Isadore Smith, based on the breach of covenants not to compete which were included in each individual's employment contract. Redd Pest was seeking injunctive relief and damages for the breach of the covenant. The special chancellor denied injunctive relief and damages and held that the contracts were unenforceable. It is from this denial that Redd Pest filed a timely appeal and presents the following issues: (1) whether the special chancellor was manifestly wrong in his factual finding that Redd Pest's announcement of increased sales goals served as an "intolerable condition" and warranted Foster's and Smith's claim of constructive discharge, and whether without a constructive discharge, there was a sufficient basis for the chancellor to deny injunctive and monetary relief, (2) whether Foster and Smith tortiously interfered with the business relations of Redd Pest by soliciting and diverting customers to a competing pest control company during the term of their restrictive covenants, and (3) whether Redd Pest offered sufficient proof at trial that it suffered substantial monetary damages. Finding the first issue to have merit, we reverse and render and grant the requested injunction; however, we remand this case to the Chancery Court of Lincoln County for a determination of the reasonableness of the terms of the covenants and the extent of damages suffered by Redd Pest.

FACTS
¶ 2. Redd Pest operates a pest control business with numerous offices located in Mississippi, as well as other states. The events which are the subject of this appeal focus on former employees of an office located in Brookhaven, Mississippi. In consideration of their employment with Redd Pest, Foster and Smith signed an employment contract.
¶ 3. Foster signed the employment contract on October 1, 1980. Smith signed the employment contract on July 28, 1965. The employment contracts contained a covenant not to compete. The covenants not to compete were substantially similar and essentially required that if Foster and Smith ceased to be employed by Redd Pest, they would not compete with Redd Pest in the counties which they formerly worked, in any manner, for a period of two years. Subsequently, Foster and Smith were employed with Redd Pest for numerous years. The following is a statement of the facts that lead to Foster's resignation and Smith's retirement from Redd Pest, and their subsequent employment with Tom Smith.
¶ 4. James R. Waitress, the Director of Human Resources and Risk Management, testified that in 1996, Redd Pest was suffering financial problems. Estimates reflected that Redd Pest was going to suffer a financial loss of between $365,000 to $400,000 in 1996. Since the company was financially strained, it hired a consulting firm to assist in improving its financial situation. Waitress further testified that commencing October 1996 and continuing through November 1996, the consulting firm worked with Redd Pest in developing a business plan.
¶ 5. The business plan was a three year plan. One facet of the plan set route goals for the technicians of Redd Pest. The plan set a goal of $7,500 for each technician's route. In January of 1997, Foster and Smith attended a meeting where they were informed of the financial condition of Redd Pest. On March 13, 1997, Foster and Smith attended another meeting concerning the financial condition of Redd Pest.
*970 ¶ 6. In the March meeting, Foster and Smith received letters that had been drafted by Jim Waitress, which informed them that Redd Pest was beginning the process of increasing the requirements regarding the income each route produced. The letter noted that it was necessary for each pest control route to produce $7,500 a month in revenue in order to be profitable, and that any routes not currently at that level must be increased. The letter went on to note that Foster's and Smith's routes were not at this level of production, and that they must start the process of increasing their routes to reach this goal. The letter acknowledged that this goal could not be reached overnight; however, during the months of March, April, May, and June they would begin the process of building their route. It was expected that their routes would be increased by $200 a month for the next three months. Ultimately, this meant an increase of $600 by the end of June 1997. Additionally, Frank Barkdull was given the responsibility of assisting Foster and Smith in achieving this goal. The letter concluded by stating that if they were unable to achieve the growth required, it would be necessary to eliminate their position and combine existing routes until the goal of $7,500 was reached. Shortly after receiving this letter, Foster and Smith left Redd Pest.
¶ 7. The record reveals that Foster terminated his employment with Redd Pest by way of resignation on March 21, 1997. Additionally, the record reveals that Smith terminated his employment by retiring from Redd Pest on March 31, 1997. On April 1, 1997, Foster and Smith became employed by another pest control business located in Brookhaven, Mississippi, known as Tom Smith Pest Control.
¶ 8. The record discloses that approximately seventy-one of Foster's former customers at Redd Pest became customers of Tom Smith. Of these seventy-one customers, approximately twenty-five of Foster's former customers were serviced by him on April 1-2, 1997. Testimony regarding Smith's route established that between thirty-nine to fifty of his seventy-five former Redd Pest customers were service by him as a technician for Tom Smith. Jim Waltress projected that Redd Pest had suffered a projected gross loss of income of $32,440.50 due to Foster's resignation and subsequent employment with Tom Smith, and Redd Pest had suffered a projected gross loss of income of $17,960 from Smith's retirement and employment with Tom Smith. Based on Foster's and Smith's employment with Tom Smith, Redd Pest filed a complaint against both gentlemen asserting breach of the non-compete clause in the employment contract and tortuous interference with business relations.
¶ 9. Redd Pest originally filed separate complaints against Foster and Smith; however, later, these actions were consolidated and one trial was held. Essentially, Redd Pest requested an injunction and damages against Foster and Smith and asserted that Foster's and Smith's employment with Tom Smith was a breach of the covenant and caused a loss in sales because of the loss of existing and potential customers.
¶ 10. The chancellor held that the March 13, 1997 letter issued to Foster and Smith was arbitrary and capricious; therefore, it was inequitable for Redd Pest to enforce the non-competition provision. Additionally, the chancellor held that Redd Pest failed to meet its burden of proof and denied relief in the form of an injunction or damages against Foster and Smith.

DISCUSSION

I. WHETHER THE SPECIAL CHANCELLOR WAS MANIFESTLY WRONG IN HIS FACTUAL FINDING THAT REDD PEST'S ANNOUNCEMENT OF INCREASED SALES GOALS SERVED AS AN "INTOLERABLE CONDITION" AND WARRANTED FOSTER'S AND SMITH'S CLAIM OF CONSTRUCTIVE DISCHARGE, AND WHETHER *971 WITHOUT A CONSTRUCTIVE DISCHARGE, THERE WAS A SUFFICIENT BASIS FOR THE CHANCELLOR TO DENY INJUNCTIVE AND MONETARY RELIEF.
¶ 11. Redd Pest asserts that the factual findings of the chancellor were manifestly wrong. It is well established law in Mississippi that an appellate court may not disturb findings when those findings are supported by substantial evidence, unless the chancellor abused his discretion, was manifestly wrong/clearly erroneous, or an incorrect legal standard was applied. Herring Gas Co., Inc. v. Whiddon, 616 So.2d 892, 894 (Miss.1993); Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309, 1313 (Miss.1989). Specifically, findings of fact by a chancellor may not be interfered with on appeal unless manifestly wrong. Bullock v. Bullock, 733 So.2d 292, 297 (Miss.Ct.App.1998). Therefore, if the Court is to conclude that the chancellor has abused his discretion, there must be a lack of sufficient evidence to support his conclusions. Id. However, if the factual finding was manifestly wrong the Court "should not hesitate to reverse." Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992). More particularly, Redd Pest contends that the chancellor erred when he determined that the March 13, 1997 letter was an arbitrary and capricious termination of Foster and Smith and prohibited Redd Pest from enforcing the non-compete clause in their employment agreements. Foster and Smith argue exactly the opposite of Redd Pest and in furtherance of the chancellor's findings.
¶ 12. Foster and Smith contend that the March 13, 1997 letter from Redd Pest placed "intolerable conditions" on them since it set a future goal of $7,500 in income for each of their routes. Foster and Smith testified at trial that they did not believe that they could have raised the income of their routes to $7,500; therefore, they considered themselves to be without a job. In order for a constructive discharge to have occurred the employer must have made conditions so unbearable that in turn the employee feels compelled to resign. Hoerner Boxes, Inc. v. Mississippi Employment Sec. Comm'n, 693 So.2d 1343, 1347 (Miss.1997) (employee resigned because of claims of sexual harassment). Before addressing the actual restrictive covenant, this Court must first determine whether the letter was tantamount to the constructive discharge of Foster and Smith.
¶ 13. This Court disagrees with the chancellor's conclusion that the March 13, 1997 letter's "unmistakable message" was drafted in such a way as to indicate "the end was clear," due to the fact that it mentioned that if Foster and Smith did not meet their quota there would be terminations and routes would be combined. Testimony revealed that Foster and Smith were not the only employees that received the letter on March 13, 1997. In fact, it appears there were eight other Redd Pest employees at the March 13, 1997 meeting that were handed essentially the same letter. Additionally, the letter was drafted in positive phrases such as: "we must begin the process of increasing those routes that are not at that level," and "I know that it is not possible to do this overnight." In fact, initially Redd Pest was requesting a $200 a month increase for the routes of Foster and Smith. Additionally, Waitress, the author of the letter, and Harris Sergeant, former consultant and president of Redd Pest, testified that the plan was to be implemented over a three year period, and that no reduction in technicians was ever contemplated. Furthermore, Sergeant informed the chancellor that no technicians had been terminated as of the date of the hearing, and that the income of routes had been gradually increasing. There was also evidence admitted as exhibit 8 which showed that several technicians had increased their routes since the issuance of the March 13, 1997 letter.
¶ 14. In December of 1995, eighteen technicians were producing an income of $7,500 or more on their routes. In July of *972 1997, forty-five technicians had routes which grossed $7,500 or more. Amongst these figures were two technicians located in Kosciusko, Mississippi. This is of significance because Kosciusko was compared to Brookhaven relative to the size of the service area.
¶ 15. The record reveals that Foster voluntarily resigned on March 21, 1997, and Smith voluntarily retired on March 31, 1997. It was undisputed that Foster and Smith began working for Tom Smith on April 1, 1997. This means that Foster had allowed a meager eight days to reach the ultimate goal of $7,500, and Smith had allowed approximately thirteen days to do the same.
¶ 16. Foster testified that at the time he was issued the letter by Redd Pest one employee inquired about the result if the quota was not met and the response was "we [would] worry about that when the time come." Foster testified that he received the same response when he asked the same question of the regional manager, "Edward [sic] Pennington".
¶ 17. This Court also finds that the chancellor misplaced importance on the fact that Frank Barkdull, the supervisor who had been tasked with the duty of assisting Foster and Smith with increasing their routes, retired on March 31, 1997; therefore, supporting the conclusion that the March 13, 1997 letter from Redd Pest was an arbitrary and capricious termination. The Court comes to this conclusion because Foster left Redd Pest two weeks prior to Barkdull's retirement and Smith left the very same day. Neither employee remained to see if additional help would be forthcoming. Unlike, the chancellor's conclusion that the termination of Foster and Smith was caused by Redd Pest as a result of the March 13, 1997 letter, and that such action was arbitrary and capricious, this Court finds that there was no substantial evidence to support this conclusion. The chancellor was manifestly wrong in his factual findings and abused his discretion. The testimony disclosed that it was a practical business-wide approach to obtain profitability. We must now address whether the covenant placed an undue hardship on Foster and Smith, therefore, rendering it unenforceable.
¶ 18. When this Court reviews the findings of fact of the chancellor in contemplating the enforceability of a restrictive covenant within an employment agreement, we review the entire record and "the evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact, must be accepted." Empiregas, Inc. of Kosciusko v. Bain, 599 So.2d 971, 975 (Miss.1992) (citing Sta-Home Home Health Agency v. Umphers, 562 So.2d 1258, 1263 (Miss.1990))(quoting Culbreath v. Johnson, 427 So.2d 705, 707 (Miss.1983)).
¶ 19. Contracts which contain non-compete agreements have been viewed by this Court as contracts that restrict trade and individual freedom and are not favored by the law. Frierson v. Sheppard Bldg. Supply, Co., 247 Miss. 157, 154 So.2d 151, 156 (1963); Texas Rd. Boring Co. of Louisiana-Mississippi v. Parker, 194 So.2d 885, 889 (Miss.1967). Nevertheless, if such agreements are reasonable they are valid and upheld by this Court. Frierson, 154 So.2d at 156. This Court is also mindful that when the chancellor finds that the termination of the employee was arbitrary, capricious or in bad faith, equity can be extended and the chancellor may refuse to enforce the agreement. Id. at 155.
¶ 20. The validity and enforceability of a non-compete clause is largely based upon the reasonableness and specificity of its terms, in particular, the interval of the restriction and its geographic scope. Redd Pest Control Co. v. Heatherly, 248 Miss. 34, 157 So.2d 133 (1963). The employer has the burden of proving the reasonableness of these terms. Texas Road Boring Co., 194 So.2d at 889. There *973 are three aspects that are examined to determine the enforceability of a non-compete agreement: (1) the rights of the employer, (2) the rights of the employee, and (3) the rights of the public. Id. We will first address the issue of the rights of the public as it pertains to the affect of the non-compete clauses.
¶ 21. Foster and Smith argue that there is a public interest involved because the customers received a cheaper rate when serviced by Tom Smith as opposed to Redd Pest. However, in Wilson v. Gamble, 180 Miss. 499, 177 So. 363, 365-66 (1937), the supreme court acknowledged that the public will not be viewed to have been harmed by a covenant not to compete when ample services are available and a monopoly is not created. In the case sub judice, testimony given by Foster revealed that the public did not suffer a lack of service due to the employment agreements of Foster and Smith which contained the non-compete clauses. Indeed, the testimony disclosed that Redd Pest was not the only pest control service in the Brookhaven area. In fact, Foster stated there were at least six or seven pest control companies in town to service the area. Foster went on to classify the Brookhaven market as "very competitive." Therefore, the citizens of this area had numerous choices on who would have the privilege of providing their extermination needs. Since the public was not harmed by the agreement we must now balance the rights of the employee versus the employer.
¶ 22. At the time of the hearing, Sergeant explained that covenants not to compete were basically an industry standard. Sergeant testified that the restrictive covenants were used in this particular business for the following reasons: (1) the money and time involved in training employees, (2) money spent advertising, and (3) the technician that services the house is how the customers identify with the company in the community. Therefore, if the technician "should leave that business, the company had lost the only thing that they've got marketable, which is that customer list." In the case at bar, the very purpose of the restrictive covenant was to prevent a loss in the customer base serviced by a former employee due to the employees transfer to similar employment in the same industry. The very scenario which the covenant was intended to prevent became a reality when Foster and Smith relinquished their positions with Redd Pest and immediately became employed by Tom Smith.
¶ 23. Testimony provided by Redd Pest established that they had lost over one hundred customers to Tom Smith when Foster and Smith relocated from Redd Pest to Tom Smith. Additionally, testimony also revealed that Redd Pest had suffered a projected two year gross loss of approximately $50,400.50. Furthermore, the testimony of Foster showed that while he was employed by Redd Pest he was working in the counties of Lincoln, Franklin, Lawrence, and Copiah. Testimony further showed that the areas which Redd Pest wished to restrict future employment for the two year period were in the same aforementioned counties. Additionally, it was established that while Foster had been working for Tom Smith he had been servicing customers in the counties of Lincoln, Franklin, and Lawrence. The same was essentially true for Smith.
¶ 24. The chancellor erred in coming to the conclusion that an undue hardship would be placed on Foster and Smith. Foster's testimony revealed that he lacked diligence in attempting to obtain employment outside of the pest control industry. Foster testified that he had only submitted applications with two companies. Additionally, Foster also testified that he had not sought employment in McComb which was approximately 20 miles from Brookhaven.
¶ 25. In the case of Smith there is no undue hardship for the following reasons: (1) Smith was seventy years old and drawing social security, and (2) he had a 401K plan which he was not yet drawing from, *974 and also lacked in his diligence to obtain employment outside of the realm of the pest control industry. Smith testified that he had not sought employment anywhere other than with Tom Smith. Both men became employed with Tom Smith on April 1, 1997. This again reiterates the fact that Foster had only appropriated approximately ten days towards his search for future employment before beginning his employment with Tom Smith, and Smith had allowed approximately one day before doing the same. Redd also presented testimony relative to the impact Foster's and Smith's actions had had on its business in the Brookhaven area.
¶ 26. For the aforementioned reasons, we find that the chancellor's findings of fact were manifestly in error and rule that there was no constructive termination of the contracts with Foster and Smith. The issue of the reasonableness of any remaining terms of the contract not previously addressed by this Court may be revisited by the chancellor. Additionally, we remand this case for a finding by the lower court relative to the extent of damages Redd Pest suffered due to the breach of the covenants not to compete by Foster and Smith. Since any such damages awarded would necessarily cover any separate claim for tortious interference with contract for luring away Redd Pest customers, the dismissal of the tortious interference claim is affirmed.
¶ 27. THE JUDGMENT OF THE CHANCERY COURT OF LINCOLN COUNTY IS REVERSED AND RENDERED IN PART, AND REMANDED IN PART TO THE CHANCERY COURT OF LINCOLN COUNTY FOR FINDINGS NOT INCONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL WILL BE EQUALLY SHARED BETWEEN THE APPELLANT AND APPELLEES.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, MOORE, AND THOMAS, JJ., CONCUR. PAYNE, J., NOT PARTICIPATING.