GRIFFIS, J., for the Court:
¶ 1. This appeal arises from the circuit court’s grant of a judgment notwithstanding the verdict, under Mississippi Rule of Civil Procedure 50(b), which is commonly referred to as a “JNOV.” The appellant, Business Communications, Inc. (“BCI”), brought several employment related claims against its former employee, Albert Banks, the appellee. After a trial, the jury awarded BCI $1,000 in damages for Banks’s breach of a “Business Protection Agreement” (“BPA”) due to Banks’s subsequent employment with a competitor-company, GKR Systems, Inc. d/b/a Venture Technologies (“Venture”). The jury also awarded BCI $9,000 in damages for *3 Banks’s breach of the cost-reimbursement provision of the BCI employee handbook (“RCA”). The circuit court then granted Banks’s motion for a JNOV and entered a final judgment in favor of Banks. It is from this judgment that BCI now appeals.
FACTS
¶ 2. BCI is a technological solutions company. Its business includes the design, implementation, and maintenance of the following: (1) internet protocol telephony and traditional phone systems,' (2) network security, (S) wireless communications, (4) structured cabling systems, (5) data storage, (6) internet services, (7) software services, and (8) hardware maintenance.
¶ 3. On March 2, 2001, BCI extended a written offer of employment to Banks for a position as “Lead Consulting Engineer.” Banks accepted the offer and began working for BCI on March 19, 2001.
¶ 4. Banks brought with him approximately twelve years of computer-technology experience: four to six years of graduate and undergraduate education in computer science and internet technology and six years of work experience in the informationTsystems field. Banks also had received a number of technology certifications. Of particular interest to BCI, Banks had obtained a certificates for Cisco Certified Internetwork • Expert (“CCIE”) and Microsoft Certified System Engineer (“MCSE”).
¶ 5. BCI’s employment offer was contingent upon Banks’s signing the BPA. It included a non-competition provision, which provides:
For a period of one (1) year after termination of Employee’s employment with the Company, whether voluntarily or involuntarily terminated by either party with or without cause or notice, the Employee hereby agrees not to render services, directly or indirectly, whether as principal or agent, officer, director, employee, advisor, consultant, shareholder, or otherwise, alone or in association with any other person or entity, to or for any Competitor of the Company within a 150 mile radius of (a) the location of any office of the Company and (b) from any place where the business of the Company is being conducted, whether or not the Company established an office in such location.
¶ 6. Banks signed the BPA on March 8, 2001. Banks was also provided a copy of BCI’s employee handbook. He signed an acknowledgment of receipt. The employee handbook expressly disclaimed any employment contract, with the following language:
I acknowledge and agree that nothing in this Employee Handbook is intended to create or constitute an employment agreement with any employee. As an employee covered by this Employee Handbook, I acknowledge and agree that my employment is for no definite period of time and may be terminated, with or without cause, at any time in accordance with the Employee Handbook, at my option or at the option of BCI.
¶ 7. In addition, on March 8, 2001, Banks executed a separate stand-alone agreement entitled “Reimbursement of Costs” (“2001 RCA”), which provides:
I understand that during the course of my employment, [BCI] may necessarily incur certain fees and expenses related to my employment. Therefore, I hereby agree that should I terminate my employment with [BCI] within one year of my date of hire, I will be responsible for reimbursing to [BCI] all expenses which may have been incurred by the Company with regard to my relocation, training, and/or certifica *4 tion of any kind. I understand and agree that a sum equal to this amount will become immediately due and payable, with or without notice, and without demand therefore, on the date of my separation from employment, and I agree to immediately reimburse to [BCI] this amount.
¶8. In his first year of employment, Banks was promoted to “Vice-President of Emerging Technologies.” During his employment with BCI, Banks was primarily responsible for the installation and support of the local and wide-area network Cisco equipment sold to BCI’s customers. Banks also often assisted BCI’s sales personnel with prospective customers to help explain the technology and how it might be implemented to best meet the customer’s needs. As a salaried employee, Banks did not receive a commission for any of the goods and services BCI sold. Except for a brief period when Banks voluntarily took a cut in pay, Banks’s salary remained the same throughout his employment with BCI.
¶ 9. In January 2005, Banks placed his resume on the employment web site “Monster.com.” As a result, in November 2005, Venture made contact with Banks about potential employment. In response, Banks told Venture’s representative that he had signed a non-compete agreement with BCI and that he could not work for Venture because the company was a competitor of BCI.
¶ 10. On March 31, 2005, BCI issued a new employee handbook and distributed it to its employees via e-mail. The new employment handbook contained, on page thirty-five, a new RCA (“2005 RCA”). Banks did not sign an acknowledgment of receipt of the 2005 handbook or the 2005 RCA. The 2005 RCA, essentially, was identical in form to the 2001 RCA, in that it contained a space for the employee’s signature, the employee’s printed name, the date, and a witness’s signature. It provided different terms than the 2001 RCA, stating:
I understand that during the course of my employment, [BCI] may necessarily incur certain fees and expenses related to my employment. Therefore, I hereby agree that should I terminate my employment with [BCI], I will be responsible for réimbursing [BCI] all expenses which may have been incurred by [BCI] with regard to my relocation, training, and/or certification of any kind within the previous twelve months. In addition, I agree to returned [sic] or reimburse [BCI] for any outstanding advances, per diems, travel, tools or equipment that have been issued to me. I understand and agree that a sum equal to this amount will become immediately due and payable, with or without notice, and without demand therefore, on the date of my separation from employment, and I agree to immediately reimburse to [BCI] this amount.
(Emphasis added).
¶ 11. In January 2006, a representative of Venture again contacted Banks. Venture formally extended Banks an offer of employment on February 7, 2006. Banks accepted. He formally tendered his resignation to BCI on February 15, 2006.
¶ 12. The same day, Tony Bailey, BCI’s owner, called Banks into his office and asked Banks where he was going. Banks declined to tell him. Bailey reminded Banks that he had signed a BPA, and he said to Banks, “Do you understand that if you go to work for a competitor, I will come after you to the nth degree?”
¶ 13. Banks left BCI on February 28, 2006. Shortly thereafter, BCI learned that Banks had gone to work for Venture.
*5 ¶14. In March 2006, BCI filed a lawsuit in the Madison County Chancery Court against Banks and Venture. The complaint alleged two causes of action against Banks: (1) breach of the BPA, and (2) misappropriation of trade secrets and confidential/proprietary information in violation of the BPA and Mississippi law. The complaint alleged three causes of action against Venture: (1) tortious interference with contract, (2) intentional interference with business relations and prospective business advantage, and (3) misappropriation of trade secrets and confidential/proprietary information in violation of the BPA and Mississippi law. Banks and Venture timely answered the complaint and denied all claims.
¶ 15. Along with the complaint, BCI filed a motion for temporary injunction and a restraining order. BCI sought to restrain or enjoin Banks from working at Venture. Banks and Venture responded, and Venture offered the following two documentary exhibits:
(1) an agreement entered into between Banks and Venture (on February 13, 2006) wherein Banks’s employment with Venture would be restricted so as to prevent Banks from unfairly competing with BCI by using his knowledge of BCI confidential information or trade secrets, if any, and that would prevent Banks from soliciting/servicing former BCI customers; and
(2) an affidavit from Venture’s President, Gerard Gilbert, swearing under oath that Venture and Banks had both adhered to their agreements to prevent any unfair competition by Banks against BCI.
¶ 16. The chancery court transferred the case to the Madison County Circuit Court. In August 2006, the circuit court entered an agreed order on BCI’s motion for injunctive relief. The order permitted
Banks to continue his employment at Venture, and it enjoined Banks from disclosing any of BCI’s confidential information and soliciting or servicing any of BCI’s customers. The parties were required to pay their own costs and attorney’s fees incurred with the temporary restraining order and preliminary injunction.
¶ 17. In March 2007, following discovery, BCI filed an amended complaint. The amended complaint eliminated all claims against Banks and Venture except for BCI’s claims against Banks for breach of contract and BCI’s claim against Venture for tortious interference with a contract. In December 2007, the circuit court granted partial summary judgment and dismissed with, prejudice BCI’s claim against Venture for tortious interference with a contract.
¶ 18. In October 2008, a jury trial was held on BCI’s breach of contract claims against Banks. In addition to other evidence, BCI presented evidence of Venture’s agreement to reimburse Banks up to $10,000 to defend against any legal action BCI undertook to enforce the terms of the BPA. The jury’s verdict found that Banks had breached both the BPA and the 2005 RCA. The jury awarded BCI $1,000 as damages for Banks’s breach of the BPA and $9,000 as damagés for his breach of the 2005 RCA.
¶ 19. Banks then timely filed a motion for a JNOV or, in the alternative, a new trial or a remittitur of the damages awarded. BCI responded to the motion and filed a motion for an award of attorney’s fees and costs in the amount of $63,597.
¶ 20. The circuit court granted Banks’s motion for a JNOV. In its order, the circuit court found:
As to the breach of the BPA, the Court finds as a matter of law that the evidence presented by- BCI at trial was *6 insufficient to satisfy its burden to prove all of the essential elements of its case. Covenants not to compete only protect against “unfair” competition by a former employee. Being disfavored by law, these agreements are never enforced to prevent fair competition in the marketplace. BCI’s proof failed to show that it was subject to unfair competition as a result of the Banks’[s] employment by Venture Technologies.
The Court notes that BCI and Venture Technologies were competitors before Banks started work for Venture and remained competitors after Banks was working there. The evidence failed to show that there was any change in competition between these two companies as a result of Banks’[s] employment. Because BCI’s proof, as a matter of law, failed to show that it suffered any unfair competition, the jury’s verdict cannot stand and must be set aside.
[[Image here]]
Regarding [the] breach of the 2005 RCA, the Court finds that BCI’s proof was legally insufficient to show that there ever existed a legally valid and binding contract. First, the 2005 RCA was never signed by Banks or witnessed by anyone. It was contained in a revised Employee Handbook that Banks never saw or acknowledged receiving.
Second, the course of dealings between the parties showed that Banks had earlier signed a stand-alone RCA in March of 2001 which was duly witnessed by his supervisor. The unsigned 2005 RCA was materially different from the signed March 2001 RCA regarding the period of time Banks would be required to reimburse BCI for certain items of expense. There was no proof of a “meeting of the minds” regarding this purported material change. Finally, the March 2, 2001[,] offer letter signed by Banks and later incorporated into his employment agreement, expressly stated that “[njeither the Employee Handbook nor any explanation of BCI’s policies and guidelines you may receive will constitute an express or implied contract for any purpose or otherwise affect your status as an employee at-will.”
Accordingly, the Court finds that there was never a valid, legally enforceable RCA between the parties and [that] the jury’s verdict cannot stand.
¶ 21. On appeal, BCI asks this Court to reverse the trial court’s grant of the JNOV and render a decision that reinstates the jury’s verdict. BCI also asks that the Court to remand this case to the circuit court for consideration of its motion for award of attorney’s fees and costs.
STANDARD OF REVIEW
¶ 22. A motion for a JNOV made under the procedural vehicle of Mississippi Rule of Civil Procedure 50(b) requires a trial court to test the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence. Tharp v. Bunge Corp., 641 So.2d 20, 23 (Miss.1994).
¶ 23. On appeal, this Court review is de novo. White v. Stewman, 932 So.2d 27, 32 (¶ 10) (Miss.2006). Indeed, for our consideration, this Court must apply the “same criteria” that the trial court would consider:
This Court will consider the evidence in the light most favorable to the appellee nonmovant, giving that party the benefit of all favorable inference[s] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant movant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On *7 the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.

Id.

ANALYSIS
A. Claim for Breach of Business Protection Agreement
¶ 24. BCI claims that the circuit court erred when it granted Banks’s motion for a JNOV and entered a judgment as a matter of law in favor of Banks on the breach-of-eontract claim for damages based on the BPA.
¶25. This issue actually contains two parts. First, BCI argues that Mississippi law does not require a finding of “unfair competition” to enforce a non-competition agreement. Second, if a finding of “unfair competition” is the proper legal element, then it was not presented before the jury was instructed, was not contained in the jury instructions, and was not part of the jury’s deliberation and decision.
¶ 26. Our review will focus on whether “the trial judge applied the correct law.” Id. In the order granting the motion for a JNOV, the circuit court ruled:
As to breach of the BPA, the Court finds as a matter of law that the evidence presented by BCI at trial was insufficient to satisfy its burden to prove all of the essential elements of its case. Covenants not to compete only protect against “unfair” competition by a former employee. Being disfavored by law, these agreements are never enforced to prevent fair competition in the marketplace. BCI’s proof failed to show that it was subjected to unfair competition as a result of Banks’[s] employment by Venture Technologies.
The Court notes that BCI and Venture Technologies were competitors before Banks started work for Venture and remained competitors after Banks was working there. The evidence failed to show that there was any change in competition between these two companies as a result of Banks’[s] employment. Because BCI’s proof, as a matter of law, failed to show that it suffered any unfair competition, the jury’s verdict cannot stand and must be set aside.
(Emphasis added).
¶ 27. We find that the circuit court erred when it found that to establish a breach of the non-competition agreement BCI had to prove some “unfair” competition resulted from Banks’s employment with a competitor. No such term existed in the BPA between Banks and BCI. There was no such evidentiary requirement in the BPA, and no such requirement exists under Mississippi law. There was simply no authority for the circuit court to have compared the competition between BCI (Banks’s former employer) and Venture (Banks’s current employer) to conclude whether the covenant not to compete in the BPA should be enforced. Thus, we find the circuit court erred as a matter of law.
¶ 28. The circuit court determined that the outcome of the case was controlled by this legal proposition — “Covenants not to compete only protect against ‘unfair’ competition by a former employee.” This proposition it takes existing legal authority out of context. We do, however, recognize that the supreme court has used the words “unfair competition” in an earlier opinion. In Donahoe v. Tatum, 242 Miss. 258, 261, *8 134 So.2d 442, 445 (1961), the supreme court held:
“It is the law’s function to maintain a reasonable balance in this area. This ‘requires us to recognize that there is such a thing as unfair competition by an ex-employee as well as by unreasonable oppression by an employer.’ ” The circumstances of each case will be carefully scrutinized to determine whether it falls within or without the boundary of enforceability.
(Citation omitted).
¶ 29. The Donahoe court upheld the enforcement of a covenant not to compete. Id. The facts of Donahoe are strikingly similar to the case before this Court. However, Donahoe does not stand for the legal proposition that “[c]ovenants not to compete only protect against ‘unfair’ competition by a former employee.” Instead, Donahoe supports the jury’s verdict in favor of BCI.
¶ 30. In Donahoe, Rudy Tatum owned and managed an employment agency. Id. at 257, 134 So.2d at 443. Barbara Dona-hoe had worked at the agency, and she agreed to and signed a covenant not to compete. She left the agency and went to work for a competitor. Id. Tatum brought an action to prevent Donahoe’s violation of the covenant not to compete. Id. at 255, 134 So.2d at 442. In the covenant, Dona-hoe agreed to the following:
never to be employed by, or to install for myself, or to be employed by another company for the purpose of operating an employment agency within the boundary of Hinds County, Mississippi, for a period of five years following my separation from [Tatum’s company]. I further agree and contract never to divulge any information contained in the office files of [Tatum’s company] to anyone for any reason.
Id. at 256-57, 134 So.2d at 442-43. The chancery court granted the injunction against Donahoe. Id. at 256, 134 So.2d at 442-43.
¶31. At trial, Tatum established that “[a]ll of the information available to the owners of the business was available to her.” Id. at 257, 134 So.2d at 443. Dona-hoe “received job orders from employers, different types of confidential information, and screened applicants to fit the orders.” Tatum testified that “the purpose of the contract was to protect his agency in its business, because it was a personal and confidential type of operation, with trade secrets and confidential relations with large employers and applicants for jobs.” Id. After Donahoe left her employment with Tatum’s company, she went to work for a competitor employment service. Tatum testified that “Donahoe in her new job is calling former clients of his agency [and] that she is an excellent employment counselor, [who] knows his agency’s business, trade secrets, and confidential information.” Id. at 258, 134 So.2d at 443.
¶ 32. Donahoe testified that she knew she had signed the contract, but she thought “its terms were unreasonable.” Id. Donahoe “denied that she had been soliciting business away from Tatum, although she admitted her new employer had widely mailed a printed announcement of her association with him. She said she has not divulged any confidential information learned at [Tatum’s company and] that she does not know anything which would enable her to harm [the] appellee.” Id. at 258,134 So.2d at 443-44.
■ ¶ 33. The chancellor concluded that the contract was “not unreasonable.” In fact, the chancellor enjoined Donahoe “from employment with an agency in Hinds County until the expiration of five years from the date of the contract.” Id. at 259,
*9 134 So.2d at 444. The Mississippi Supreme Court held:
We do not think [Donahoe’s] contract imposes an unreasonable restraint of trade so as to render it unenforceable. A bargain by an employee not to compete with the employer after the employment has terminated falls within this permissible category, provided the agreement is within such territory and during such time as may be reasonably necessary for the protection of the employer, without imposing undue hardship of the employee, and provided there is a reasonable basis for the covenant. The validity of such an agreement is dependent upon such considerations as the nature and character of the employment, the size and conditions of the locality to which the prohibition extends, and the duration of the prohibition. In short, the evidence must show the reasonableness of the restriction with respect to the nature of the employment, the duration of the period of restraint, and the scope and extent of the restriction, territorially.
Id. (emphasis added). The supreme court upheld the chancellor’s decision and ruled:
Donahoe’s employment with [Tatum’s company] was of such character as to inform her of its business methods, confidential information, and trade secrets. These facts, if brought to the knowledge of a competitor, would prejudice the interests of the employer. She acquired confidential knowledge and acquaintance with the employer’s clientele. These factors indicate the reasonableness of the agreement from the point of view of the employer.
With reference to the employee, she is a well-educated person and understood the contract which she was signing. The chancellor correctly found that [Do-nahoe] is trained in other areas of work, and has sufficient talent and experience to earn a living in other pursuits during the period of the covenant. He was justified, therefore, in holding that there would be no such undue hardship upon [Donahoe] as would invalidate her contract. Nor does the evidence indicate that the agreement tends to promote a monopoly. [Tatum’s company] has seven competitors in Hinds County. Competition among employment agencies appears to be vigorous.
Id. at 259-60, 134 So.2d at 444 (emphasis added).
¶ 34. After the supreme court upheld the enforcement of the covenant, the court discussed several earlier cases (one from 1859) where similar covenants were interpreted. Then, the supreme court included the following language:
It is the law’s function to maintain a reasonable balance in this area. This “requires us to recognize that there is such a thing as unfair competition by an ex-employee as well as by unreasonable oppression by an employer.’’ The circumstances of each case will be carefully scrutinized to determine whether it falls within or without the boundary of enforceability. 6 Corbin, Contracts (1951), Sec. 1394; 5 Williston, Contracts (Rev. Ed.1937), Secs. 1659, 1660; Anno., 41 A.L.R.2d 15 (1955).
The evidence here shows that [Donahoe] contracted to forbear from competition in Hinds County for five years. [Tatum’s company] made available to her, and she possesses, confidential information, and the business methods and trade secrets of this employment agency. [Tatum’s company] has suffered, and may suffer in the future, substantial harm if [Donahoe] is permitted to violate the contract. Nor does it place an undue burden upon [Donahoe], The facts of each case will be carefully *10 examined as to the reasonableness of such restrictive covenants. The evidence here supports the decree enforcing [DonahoeJ’s contract.
Donahoe, 242 Miss, at 261, 134 So.2d at 445 (emphasis added).
¶ 35. The supreme court’s decision in Donahoe simply cannot be read to require a former employer to prove “unfair competition” to prevail orí a claim to enforce a covenant not to compete. Instead, this language reads that the court should look at the restrictions contained in the covenant to determine whether such restrictions need to be reduced.
¶ 36. Mississippi courts have held that an employer has an interest in the protection of its customer base, its goodwill, and its ability to succeed in a competitive marketplace. Empiregas, Inc. of Kosciusko v. Bain, 599 So.2d 971, 976 (Miss.1992). “The primary right of the employer is that of ‘protecting the business from loss of customers by the activities of the former employees who have peculiar knowledge of and relationships with the employer’s customers.’” Herring Gas Co. v. Magee, 813 F.Supp. 1239, 1245 (S.D.Miss.1993) (quoting Redd Pest Control Co., Inc. v. Heatherly, 248 Miss. 34, 43, 157 So.2d 133, 136 (1963)). Covenants not to compete are valid and enforceable if they protect an employer’s investment in the training and education of an employee. Redd Pest Control Co., Inc. v. Foster, 761 So.2d 967, 973 (¶ 22) (Miss.Ct.App.2000); Taylor v. Cordis Corp., 634 F.Supp. 1242, 1247-49 (S.D.Miss.1986); Texas Rd. Boring Co. of La.-Miss. v. Parker, 194 So.2d 885, 889 (Miss.1967); and Heatherly, 248 Miss, at 43,157 So.2d at 136.
¶ 37. In Foster, Redd Pest Control filed claims against two former employees based on the breach of covenants not to compete. Foster, 761 So.2d at 969. The chancery court ruled for the employee, and Redd Pest Control appealed. In a unanimous opinion written by Judge Lee, this Court held that the chancellor erred in failing to enforce the covenant not to compete in part because the covenant protected “the money and time involved in training employees.” Id. at 973.
¶ 38. In Taylor, a pacemaker manufacturer had extensively trained the defendant former employee to sell pacemakers to physicians. Taylor, 634 F.Supp. at 1243. The former employee brought a declaratory-judgment action requesting that the court rule that his contract of employment was void and unenforceable. The employer counterclaimed for a preliminary injunction to enforce the covenant not to compete. The district judge interpreted Mississippi law and held that the former employee was not entitled to rescission of the contract. Id. at 1247. The court also found that the employer was entitled to preliminary injunction to enforce the covenant. Id. at 1252. The court concluded:
This court is of the opinion that Cordis sustained its burden of demonstrating the economic justification for its agreement with Taylor. In the pacemaker sales industry the customers, in most cases the physicians, rely primarily on the salesperson and have little or no contact with the company prior to purchasing a pacemaker. Throughout the period during which Taylor was in training, and later when he was establishing his and Cordis’[s] credibility with the physicians, Cordis paid all his salary and expenses. Under similar circumstances, the Mississippi Supreme Court has stated that it is proper for the court to take into consideration the fact that [the employer] spent large sums of money over a period of time to establish the business and acquire the customers. Redd Pest Control Co. v. Heatherly, 248 Miss. 34, *11 157 So.2d 183, 136 (1963). See also Texas Rd. Boring Co. of Louisiana-Mississippi v. Parker, 194 So.2d 885, 889 (Miss.1967).
Id. at 1248.
¶ 39. These cases make it clear that, under Mississippi law, covenants not to compete are valid and enforceable. Such covenants may be used to protect confidential information, trade secrets, proprietary information, customer lists, vendor relationships, business practices, and the employer’s investment in training and education of an employee. The employee may not simply take such information to a competitor. Mississippi courts have enforced covenants not to compete when former employees who, like Banks, have peculiar knowledge of and relationships with the employer’s customers and vendors. See Herring Gas, 813 F.Supp. at 1245.
¶ 40. The enforceability of a non-compete agreement “is largely predicated upon the reasonableness and specificity of its terms, primarily the duration of the restriction and its geographic scope.” Empiregas, 599 So.2d at 975. A court must also examine the covenant’s effect on “the rights of the employer, the rights of the employee, and the rights of the public,” and balance these respective interests. Texas Rd. Boring, 194 So.2d at 888.
¶41. Here, the circuit judge focused on the competition between the two employers, BCI and Venture. The balancing test is actually between the employer (BCI), the employee (Banks), and the public. What BCI sought to protect was Banks’s giving of information to Venture that could be used to improve Venture’s competitive advantage. Banks had access to BCI’s confidential information and proprietary business methods. Banks acknowledged the importance of this when he signed the BPA, which states:
Employee recognizes that the Company engages in the business of network communication systems integration and consulting, and that such business requires confidentiality in connection with many of its methods and operating procedures, including without limitation names and addresses of the Company’s customer, sources of buying, training methods, and techniques of organization. During the course of his/her employment, Employee may become knowledgeable of the Company’s confidential information. In addition, Employee may develop on behalf of the Company a personal acquaintance with the Company’s present customers, suppliers, and/or other business-related contact which acquaintance may constitute the Company’s only contact with such individuals or entities. As a result, Employee will occupy a position of trust and confidence with the respect to the Company’s affairs and products.
The territorial scope and period of restriction in the BPA was reasonable. The BPA prohibited Banks from competition only in the areas where BCI has an office. Banks admitted at trial that he could work in other cities where BCI had no offices. The one-year term of the BPA was reasonable.[1]
*12 ¶42. The second part of our review concerns the jury instructions. Indeed, there appears to be a startling contrast in the law that was used in the jury instructions and that which was used in the order granting a JNOV. The circuit judge considered, in a post-trial motion, a legal element that was not presented before the jury was instructed, was not contained in the jury instructions, and was not part of the jury’s deliberation and decision. Indeed, we find it error that the circuit judge added a legal element of proof post-trial.
¶ 43. The jury instructions that were given by the trial court on the issue of the breach of the non-competition agreement read as follows:

Jury Instruction No. 12

The Court instructs the jury that the Business Protection Agreement 1) prohibited A1 Banks from rendering service to any competitor of Business Communications, Inc. located within a 150 mile radius of the location of any Business Communications, Inc. office for a period of one (1) year after termination of his employment with Business Communications, Inc., that served to protect a legitimate business interest as defined; 2) prohibited A1 Banks from retaining written material, information, records, and documents or copies of same made by him or coming into his possession concerning the business or affairs of Business Communications, Inc.; and 3) required A1 Banks to promptly return to Business Communications, Inc. all written material, information, records, and documents made by him or coming into his possession concerning the business or affairs of Business Communications, Inc., including without limitation Confidential Information, and any other property in his possession owned or leased by the Business Communications, Inc. If you find that A1 Banks violated one or more of the above conditions of the Business Protection Agreement with Business Communications, Inc., you may find that he was in breach of his agreement with Business Communications, Inc.

Jury Instruction No. 13

“Legitimate” business interests are protection from loss of customers and goodwill, disclosure of confidential and proprietary business information and misappropriation of “trade secrets” and training costs.

Jury Instruction No. H

The Court instructs the jury that in determining the validity and enforceability of the covenant not to compete provision in the' Business Protection Agreement between Business Communications, Inc., and Albert Banks, you consider the following factors: 1) [t]he rights of Business Communications, Inc., in protecting its legitimate business interests including but not limited to its confidential and proprietary information and the investment in training its employees; 2) [t]he rights of Albert Banks to not be subjected to undue hardship; and 3) [t]he rights of the public to avoid the creation of a deficiency of service in the information technology industry, or that any one information technology company in the state has created or is in danger of creating a monopoly though its use of them.
Based on the verdict, the jury followed the instructions and found a breach of the BPA There was sufficient evidence offered to establish that Banks breached the BPA.
¶44. The parties are to submit jury instructions on “substantive law of the case” to the court. M.R.C.P. 51(b). In his exceptional treatise, Professor Jeffery *13 Jackson states the reason for and requirements of jury instructions as follows:
Jury instructions are intended to advise the jury of applicable law and to instruct the jury to make the factual findings necessary to reach a verdict in a civil case.... Tactically, counsel’s role in instruction practice is clear. First, one should offer and obtain instructions correctly stating all areas of the law necessary for the client to prevail on the merits. Conversely, one should object to and obtain exclusion of any instruction offered that misstates the law, or that, through its content, phrasing or order, will mislead the jury in its deliberation.
J. Jackson, Mississippi Civil Procedure § 14:1 (2009).
¶ 45. The circuit judge’s order granting the JNOV was not consistent with the substantive law contained in the jury instructions. If indeed BCI was required to prove that “covenants not to compete only protect against ‘unfair’ competition by a former employee,” then it would be the jury’s province to determine whether the competition was “fair” or “unfair.” This would have been a factual determination. No such instructions were offered by Banks or included by the circuit court. The jury was hot instructed as to this element. The “main ‘purpose of jury instructions is to tell the.jury what facts they have to find and who has the burden of proving or disproving those facts.’ ” Neal v. State, 15 So.Bd 388, 397 (¶ 14) (Miss.2009) (quoting Harris v. State, 861 So.2d 1003, 1016 (Miss.2003)).
¶ 46. Therefore, this Court finds that the terms of the BPA are reasonable and enforceable. Banks breached the terms of his employment contract by disclosing confidential information to third parties including Venture. The nondisclosure provisions of the BPA state:
3. Covenant Not to Disclose.
(a) For the purpose of this Agreement, “Confidential Information” means information and trade secrets disclosed to Employee or known by Employee as a consequence of, or through, Employee’s employment with the Company, including information conceived, originated, discovered, or developed in whole or part by Employee, not generally known in the relevant trade or industry, about the Company’s business, but not limited to information relating to business methods or practices, training and training programs, and the documentation thereof....
(b) The Employee acknowledges that all Confidential Information is and shall at all times remain the property of the Company....
¶ 47. The evidence established that Banks, while working at BCI and in the process of seeking other employment, shared his BPA with BellSouth and Venture, two of BCI’s biggest competitors. Banks breached a material term in his employment agreement by disclosing the BPA, which was BCI’s confidential information. Banks negotiated an agreement for Venture to employ Banks and defend and indemnify him up to $10,000 if BCI attempted to enforce the terms of the BPA.
¶ 48. The BPA required Banks to return BCI’s property at the end of an his employment, stating:
4. Business Material and Property Disclosures.
All written material, information, records, and documents made by Employee or coming into Employee’s possession concerning the business or affairs of the Company, including without limitation Confidential Information, shall be the sole property of the Company, and, upon *14 termination of Employee’s employment with the Company, whether voluntary or involuntary terminated by either party with or without cause or notice, Employee shall promptly deliver the same to the Company and shall retain no copies. This includes, without limitations, customer and supplier information and lists. Employees shall also promptly return to the Company all other property in Employee’s possession owned or leased by the Company upon termination of employment.
The evidence revealed that Banks took BCI’s property with him when he left. Banks took BCI’s books, a listing of overdue work orders, several Cisco documents, a BCI employee handbook, a backup computer file containing BCI information, and BCI files stored on his personal computer. Banks testified that he retained these documents inadvertently. Inadvertent or intentional, Banks’s retention of BCI’s confidential property was a breach of the BPA.
¶ 49. Based on the appropriate standard of review, we conclude that the circuit court committed reversible error when it granted the JNOV. As to this issue, we reverse the order granting the JNOV, reinstate the jury’s verdict, and remand this case to the trial court to consider BCI’s motion for attorney’s fees.
B. Claim for Breach of 2005 Reimbursement of Costs Agreement
¶ 50. BCI’s second issue claims that the trial court erred when it granted Banks’ motion for a JNOV and entered a judgment as a matter of law in favor of Banks on the breach-of-contract claim for damages based on the unsigned 2005 RCA, which is contained in BCI’s employee handbook. Said differently, the circuit court erred when it held that there was no meeting of the minds between Banks and BCI with regard to the RCA. BCI claims that the evidence established that Banks’s duties to comply with the provisions of his employee handbook arose as part of his obligations under his employment contract with BCI. Banks counters that he did not sign the RCA, nor did he sign the handbook in general, so he should not be bound by its terms.
¶ 51. The circuit court granted Banks’s motion for a JNOV. In its order, the circuit court found:
Regarding [the] breach of the 2005 RCA, the Court finds that BCI’s proof was legally insufficient to show that there ever existed a legally valid and binding contract. First, the 2005 RCA was never signed by Banks or witnessed by anyone. It was contained in a revised Employee Handbook that Banks never saw or acknowledged receiving. Second, the course of dealings between the parties showed that Banks had earlier signed a stand-alone RCA in March of 2001 which was duly witnessed by his supervisor. The unsigned 2005 RCA was materially different from the signed March 2001 RCA regarding the period of time Banks would be required to reimburse BCI for certain items of expense. There was no proof of a “meeting of the minds” regarding this purported material change.
Finally, the March 2, 2001[,] offer letter signed by Banks and later incorporated into his employment agreement, expressly stated that “[n]either the Employee Handbook nor any explanation of BCI’s policies and guidelines you may receive will constitute an express or implied contract for any purpose or otherwise affect your status as an employee at-will.”
Accordingly, the Court finds that there was never a valid, legally enforceable RCA between the parties and [that] the jury’s verdict cannot stand.
*15 ¶52. To support its argument, BCI cites Perry v. Sears, Roebuck & Co., 508 So.2d 1086, 1088 (Miss.1987), where the supreme court held that a personnel manual “can create contractual obligations, even in the absence of a written agreement.” Further, in Perry v. Sears, Roebuck & Company, 508 So.2d 1086, 1088 (Miss. 1987) (citing Robinson v. Board of Trustees of East Central Junior College, 477 So.2d 1352, 1353 (Miss.1985)), the supreme court held that “a written contract can be modified by a policy handbook which then becomes part of the contract, but only where the contract expressly provides that it will be performed in accordance with the policies, rules and regulations of the employer.”
¶ 53. Here, there was no dispute that Banks did not sign the employee handbook or the RCA. He did, however, execute a written employment contract. BCI contends that the contract gave rise to several duties, including those contained in the employee handbook. The evidence to support this came from Banks and Derrick Lindsay, BCI’s former vice president. BCI introduced an offer letter from BCI that was extended to Banks which explicitly stated: “This letter ... is an offer of employment on the forgoing basic terms. Upon joining BCI, you may receive an employee handbook and a more detailed, formal explanation of BCI’s policies and guidelines.” In Bobbitt v. Orchard, Ltd., 603 So.2d 356 (Miss.1992), the Mississippi Supreme Court held that because an employment manual was given to all employees, it became a part of the employment agreement. While the handbook did not create a right to employment, it did create an obligation on the part of the employer to follow its provisions in reprimanding, suspending, or discharging an employee for infractions specifically covered therein. BCI contends that the RCA gave rise to obligations on the part of both Banks and BCI. We find that the employee handbook did ■ indeed give rise to duties and obligations on the part of both parties. The question, therefore, is whether there was sufficient' evidence to support the jury’s verdict that found Banks was obligated to reimburse BCI $9,000 in damages for breach of the RCA.
¶ 54. Our analysis requires that we review both provisions. First, the 2001 RCA, which was signed by Banks, provides:
I understand that during the course of my employment, [BCI] may necessarily incur certain fees and expenses related to my employment. Therefore, I hereby agree that should I terminate my employment with [BCI] within one year of my date of hire, I will be responsible for reimbursing to [BCI] all expenses which may have been incurred by the Company with regard to my relocation, training, and/or certification of any kind. I understand and agree that a sum equal to this amount will become immediately due and payable, with or without notice, and without demand therefore, on the date of my separation from employment, and I agree to immediately reimburse to [BCI] this amount.
(Emphasis added).
¶ 55. Next, the 2005 RCA provides:
I understand that during the course of my employment, [BCI] may necessarily incur certain fees and expenses related to my employment. Therefore, I hereby agree that should I terminate my employment with [BCI], I will be responsible for reimbursing [BCI] all expenses which may have been incurred by [BCI] with regard to my relocation, training, and/or certification of any kind within the previous twelve months. In addition, I agree to re *16 turned [sic] or reimburse [BCI] for any outstanding advances, per diems, travel, tools or equipment that have been issued to me. I understand and agree .that a sum equal to this amount will become immediately due and payable, with or without notice, and without demand therefore, on the date of my separation from employment, and I agree to immediately reimburse to [BCI] this amount.
(Emphasis added).
¶ 56. Here, it is the 2005 RCA that BCI seeks to enforce. The form of both RCAs was identical. They both contained a space for the employee’s signature, the employee’s printed name, the date, and a witness’s signature. The terms were slightly different. The term was changed, from “within one year of my date of hire” (2001 RCA) to “within the previous twelve months” (2005 RCA). In addition, the 2005 RCA added the sentence, “In addition, I agree to returned [sic] or reimburse [BCI] for any outstanding advances, per diems, travel, tools or equipment that have been issued to me.”
¶ 57. We find that the circuit court was correct to grant a JNOV as to the jury’s verdict that awarded BCI $9,000 in damages for Banks’s breach of the cost-reimbursement provision (2005 RCA) of the BCI employee handbook. Having carefully reviewed the BCI employee handbook included in the exhibit and the record excerpts, we note that the provision for reimbursement of costs clearly anticipated that the employee would sign, date, and have a witness sign the 2005 RCA before it would be enforceable. We might, however, be convinced by BCI’s argument that the provision could be enforced as part of the duties and obligations of the employment manual but for the fact that the form itself specifically called for and, thus, required its execution by the employee. Without the execution of the agreement by the employee, we do not find that it can be enforced. We cannot conceive why the form in the handbook would require a signature if such was not expected and necessary to advise the employee of his/ her obligation to the company. The execution would represent the “meeting of the minds” of the parties to now-' place a possibly significant financial obligation on the employee.
¶ 58. Further, we recognize that contracts must be interpreted by their terms. The 2005 RCA seems to require the payment of “all expenses which may have been incurred by [BCI] with regard to my relocation, training, and/or certification of any kind....” The record does not establish that Banks knew, or should have known, what BCI actually meant by training expenses. Banks testified that when he signed the 2001 RCA, he assumed that training expenses meant out-of-pocket expenses for “off-site training.” But according to Tom Hinds, President of BCI’s Internet Technology Group, such expenses were not taken into account. The training expenses that BCI asked for reimbursement of were the “hourly rate costs,” with/or without “overhead,” that BCI incurred while Banks was “not billing.” Hinds’s testimony, exhibit P-12, and the record indicate that here the term “training expenses” is an ambiguous term. Our courts are not bound to adopt a construction not compelled by an instrument. in which one would have to believe that no person in his or her right mind would have agreed to. See, e.g., Frazier v. N.E. Miss. Shopping Ctr. Inc., 458 So.2d 1051, 1054 (Miss.1984).
¶ 59. BCI admitted an exhibit entitled “Banksf’s] Training Cost,” identified as exhibit P-12. According to the exhibit, Banks accumulated 108.25 hours of training-time from March 1, 2005, to January 13, 2006. According to Hinds, the training, which *17 could consume up to twenty-five percent of an engineer’s work-time each week, was necessary for Banks and BCI’s other engineers to “stay abreast of the latest technology.” Some of the training activities listed on exhibit P-12, include: “reading,” “studying,” “MCSE review,” “SUN testing,” “Cisco meeting,” “Engineer meeting,” “Monthly meeting,” “Staff meeting,” “Cisco product Review,” “SUN account problems,” “Monthly Meeting,” and “Securing lab equipment.” Hinds testified that BCI entrusts its engineers with the responsibility of entering their own respective hours and identifying the training purpose.
¶ 60. Exhibit P-12 also contained two separate dollar totals, $10,763.30 and $7,174.81. According to Hinds, the first amount was calculated by multiplying $99.43 times 108.25, and the second amount was calculated by multiplying $66.28 times 108.25. Hinds said that $99.43 was Banks’s “hourly rate cost,” when taking into consideration “overhead.” The other dollar figure, $66.28, was Banks’s “hourly rate cost” without “overhead.”
¶ 61. During direct examination, Hinds attempted to explain how BCI had determined each “hourly rate cost,” stating:
A. This page shows what [Banks’s] annual salary is, and then it breaks down to a monthly rate, which is $7,083.33. And what we’re trying to get to is an hourly cost, what [Banks] cost us when he was our employee to have in the office. We use an 11 percent tax burden as an estimate, maybe a little bit higher or a little bit lower for certain employees, but we use an 11 percent tax burden. And at the time [Banks] was here, we paid for a portion of the employee’s medical benefit, 80 percent of the employee’s medical benefit. So we have that on here as well.... We take 20,080 [sic] hours a year that an employee is scheduled that are regular hours to work and divide that by 12, so you’ll come up with 173 point something, something in hours per month. So if you add those monthly numbers together, divide it out, you’ll come up with a raw hourly rate that [Banks] would have on that. It is not burdened with any overhead or administration or cost of buildings or anything else.
Q. As far as overhead is concerned, explain what you mean.
A. There are other people other than [Banks] that are supervisors and managers that were above [Banks]. There are others: [c]ustomer service, accounting, receiving, [and] purchasing people. There are other people that are required to run the business, including buildings and vehicles and gas and utilities and everything else that make up what we call the overhead calculation. So that’s what the overhead is, it’s those things not directly [Banks’s] hourly rate.
Q. Tell the jury why you think BCI is entitled to the total training personnel cost of either $10,763.30 with overhead or the [sic] without overhead number of $7,174.81. Let’s talk about with the overhead first, okay?
A. We spend a lot of time in [sic] buying the systems and the lab gear and the books and everything else for our people to study. We invest in the time for them to do it as well. We can’t retrain somebody every six months. If somebody were to leave and go where ever they go, we’ve got to retrain another individual. So we’ve got to be able to recoup that. That’s why we want to recover that. We spend a lot of time and effort making the lab gear available, making the books available, and [making] the time available to our employees *18 to do that studying. So we want to make sure that we get the full value for it and keep us on a competitive edge.
Q. As far as lab work in [sic] concerned, tell us what those costs are?
A. There’s a lot of money in equipment and gear. We actually buy kind of the latest and greatest technology. One of our partnerships with Cisco requires us to buy about $100,000 worth of gear a year. That’s the latest technology. What we do is we put that in the lab environment and allow our engineers to play with it and configure it and make it work essentially the way that it would in a typical customer environment. You don’t want them experimenting on your site and on your job when they are doing it. You want them to learn it and know it and understand it and have felt it and touched it before they got to your site.
¶ 62. Hinds’s cross-examination provided more clarity as to what each "hourly rate cost” represents, as the following colloquy reveals:
Q. Mr. Hinds, your background is in accounting, ... is that correct?
A. Yes.
Q. I may ask you a few questions and if they sound naive or even stupid, please indulge me, okay?
A. Certainly.
Q. These expenses that are reflected on this most recent exhibit, those are all for what we would call in-house events, right?
A. They [sic] would be training that was done on [sic] our facility or at [the] library or one of our partner sites, correct.
Q. Right. And there was no payment to any outside or third party vendor, correct?
A. No.
Q. So you remember yesterday we looked at some documents that had reimbursement of costs, remember that?
A. Yes, I do.
Q. I believe the last number on there was some $900.00 that was a cost that had been incurred by BCI for [Banks] to get some training?
A. That’s correct.
Q. Now, what you’re talking about here, though, is something entirely different. I just want to be sure I’m clear on it. Correct?
A. It is. It’s something different.
Q. And in effect you want — BCI wants to recover this money even though its got the benefit already of [Banks’s] work there as an employee, correct?
A. Yes, it’s correct, but also we’re not going back and retraining somebody else at that time to learn those same skill sets again.
Q. Right. You would have to do that whether [Banks] went to work for Venture or ... anywhere, correct?
A. That’s correct.
Q. And you would have to do that if [Banks] died?
A. That’s correct.
Q. The expenses that you have outlined here on this exhibit, they only include his time and some allocation of his overhead, correct?
A. The time on the third sheet, it’s his time period. On the first of the second sheet it includes a raw cost for him and then an overhead calculation as well.
Q. And those are costs that you incur in the ordinary course of your business ...?
A. They are.
Q. And they are not in the nature of any kind of costs for which you have an *19 outlay that you would not otherwise have to employ [Banks]?
A. There’s a cost to the business that we would have whether he was training or not. But in those 100 hours that he was training, he was not billing. So that’s the difference. We’re not billing when he is in training.
Q. But he was entitled to be paid in salary whether he was ... billing or not, wasn’t he?
A. That’s correct, but the value for engineers for us is to have them out billing as much as possible.
Q. So you’re telling this Court and jury that you are seeking this reimbursement for [Banks] irrespective of what his post-employment conduct is?
A. Correct.
Q. And it is not connected with the [BPA]?
A. I don’t know that I would draw the two together related to that.
¶ 68. Therefore, we find that there was not sufficient evidence to support the jury’s verdict that found Banks was obligated to reimburse BCI $9,000 in damages for breach of the RCA. Accordingly, we affirm the circuit court’s grant of a JNOV as to this issue.
¶ 64. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE PARTIES.
LEE, P.J., BARNES, ISHEE, ROBERTS AND CARLTON, JJ„ CONCUR. MYERS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, J. KING, C.J., AND MAXWELL, J., NOT PARTICIPATING.

. See, e.g., Texas Rd. Boring Co., 194 So.2d at 886 (two-year duration); Heatherly, 248 Miss, at 38, 157 So.2d at 133 (two-year duration); Bagwell v. H.B. Wellborn & Co., 247 Miss. 564, 566-67, 156 So.2d 739, 739-40 (1963) (two-year duration); Frierson v. Sheppard Bldg. Supply Co., Inc., 247 Miss. 157, 161, 154 So.2d 151, 152 (1963) (two-year duration); Donahoe, 242 Miss, at 255, 134 So.2d at 442-43 (five-year duration); Wilson v. Gamble, 180 Miss. 499, 177 So. 363, 365 (1937) (five-year duration); Foster, 761 So.2d at 969 (two-year duration); Taylor, 634 F.Supp. at 1244 (one-year duration).